In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3307

CLIFTON MORGAN,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-09271 — **Charles R. Norgle**, *Judge*.

ARGUED SEPTEMBER 29, 2015 — DECIDED MAY 6, 2016

Before WOOD, *Chief Judge*, and EASTERBROOK and RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Clifton Morgan was arrested by three Chicago Police Department ("CPD") officers—Lieutenant Duane DeVries, Sergeant Christian Tsoukalas, and Sergeant Anthony Schulz—and charged with possession of crack cocaine and resisting arrest. The Circuit Court of Cook County dismissed the charges, and Mr. Morgan brought this civil ac-

tion against the arresting officers and the City of Chicago (collectively, "the defendants"). Along with several state-law claims, he brought a claim under 42 U.S.C. § 1983 in which he alleged that the officers had conspired to violate and did violate his constitutional rights during the course of the arrest. Mr. Morgan's claims were tried to a jury, which returned a verdict for the defendants. Mr. Morgan filed a motion for a new trial, arguing that the defendants had violated the Equal Protection Clause by exercising their peremptory strikes on a racially discriminatory basis during jury selection and that the district court had committed multiple procedural and substantive errors, which had deprived him of a fair trial. The court denied the motion, and Mr. Morgan timely appealed. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

On May 2, 2011, Mr. Morgan was arrested outside a house at 7746 South Greenwood Avenue in Chicago. The arresting officers noticed Mr. Morgan as he crossed the street and pursued him on suspicion that he was in possession of a firearm. The officers apprehended Mr. Morgan outside the house, using force that Mr. Morgan would later contend was excessive but that the officers would maintain was reasonable because he was resisting arrest.

Mr. Morgan was charged with resisting arrest as well as possession of a controlled substance based on a small bag of cocaine, which the officers claimed to have found near

Mr. Morgan after his arrest. The Circuit Court of Cook County dismissed the possession charge on the ground that there was not probable cause to prosecute, and the State's Attorney dropped the charge for resisting arrest.

### B.

In December 2011, Mr. Morgan brought this civil action against the defendants in the United States District Court for the Northern District of Illinois. He asserted claims against the arresting officers under 42 U.S.C. § 1983, alleging that the officers had unlawfully stopped, falsely arrested, and used excessive force against him. He also alleged that they had conspired to deprive him of his constitutional rights. Additionally, Mr. Morgan asserted several state-law claims against the officers as well as the City of Chicago.

Mr. Morgan's case then proceeded to trial. In September 2013, the parties filed a joint proposed pretrial order as well as several dozen motions in limine. In particular, the defendants requested that the district court bar evidence that, at Mr. Morgan's preliminary hearing, the state court had entered a finding of "no probable cause" as to the possession of a controlled substance charge because this finding rested on a stricter standard of proof than probable cause to arrest.[1]

---

[1] R.57 at 10. Specifically, the defendants argued that "the Illinois preliminary examination statute requires a judge to determine from the evidence before the court 'if it appears [that] there is probable cause to believe an offense has been committed by the defendant …' 725 ILCS § 5/109–3(a)(emphasis added), not whether there was probable cause for the arrest." *Id.* (alteration in original). We have recognized this difference between the standard set forth in the Illinois preliminary examination statute

Mr. Morgan then moved to set a pretrial conference; the court granted the motion but never held a pretrial conference.

On the morning of the first day of trial, the parties brought to the court's attention the pending motions in limine. The court declined to address them; it explained that "during the course of the trial the Court will rule on motions as they are made" and directed the parties to "avoid any issue that is the subject of a motion in limine" during opening statements.[2]

The court then proceeded to jury selection. It provided a brief overview of the case to the venire, including the name of the parties, the nature of the claims, and the fact that Mr. Morgan had been arrested on May 2, 2011, near 77th and South Greenwood Avenue in Chicago. The court then called twelve members of the venire for voir dire and questioned them about their place of residence, marital status, number of children, prior jury service, and whether they were capable of being fair and impartial. The court excused one prospective juror on its own initiative; it then allowed the parties to ask additional questions of the panel.

After the parties had completed their questioning of the first twelve venirepersons, the court entertained challenges to specific potential jurors and stated that each party would be allowed three peremptory challenges. Mr. Morgan sought to remove two prospective jurors for cause. He challenged Juror Ten because she had several family members in law enforce-

---

and the standard for probable cause to arrest. *See Williams v. Kobel*, 789 F.2d 463, 470 (7th Cir. 1986).

[2] R.115-1 at 3–4; *see also id.* at 81–82.

ment and had stated that she was not sure if she could be impartial; the district court granted the challenge. Mr. Morgan also challenged Juror Five, who had stated that she was friends with a police officer who had told her "stories about people in Chicago of color—nothing against you—white, blacks—and what they have on them when they stop them."[3] When asked by the district court whether she could put aside what she had heard from her friend and be fair and impartial in this case, Juror Five had responded, "I think so."[4] After Mr. Morgan's challenge, the district court asked for a response from the defendants' counsel, who replied, "I think [Juror Five] indicated that despite what she … has learned through her friend, she could be fair and impartial."[5] The court granted Mr. Morgan's challenge of Juror Five for cause. Mr. Morgan also used peremptory challenges to strike two additional members of the first panel.

The defendants also challenged two members of the first panel for cause, Jurors Nine and Seven. Juror Nine lived on the south side of Chicago; when asked if she was familiar with the area of the 7700 block of South Greenwood Avenue, Juror Nine stated that she was and that she "live[d] not far away."[6] Juror Seven, in response to the same question, responded, "I know the area," and, "I have a couple of friends that live in

---

[3] *Id.* at 36.

[4] *Id.*

[5] *Id.* at 48.

[6] *Id.* at 44.

that area. Friend."[7] The defendants argued that the two pro-spective jurors should be removed because "th[e] case should be decided by people that have no familiarity with the area or may have contacts in any way."[8] The district court denied both challenges on the ground that a juror's familiarity with an area is not enough to support a challenge for cause. The defendants then exercised two of their peremptory challenges to strike Jurors Nine and Seven. Mr. Morgan objected to these strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), noting that both Jurors Nine and Seven were African-American. The court responded that the defendants had "already stated a race-neutral basis for exercising the peremptory challenge"—familiarity with the neighborhood and contacts with neigh-borhood residents—and that it found this to be "a sufficient showing of a nondiscriminatory basis for the" strikes.[9] The court therefore overruled Mr. Morgan's *Batson* objection.

The court then called another eight venirepersons for voir dire and again excused one juror on its own initiative. Both parties used their one remaining peremptory challenge, and the court seated the remaining jurors. Of those jurors, two—Jurors Six and Nineteen—were African-American, and both were seated without objection by either party.

Following the parties' opening statements, Mr. Morgan was the first to take the witness stand. He testified that he and four of his friends arrived at his cousin's home at 7746 South Greenwood Avenue to watch a Chicago Bulls game shortly

---

[7] *Id.* at 45.

[8] *Id.* at 49–50.

[9] *Id.* at 51.

before 7:00 p.m. on May 2, 2011. After standing outside the
front gate of the house and talking for about twenty minutes,
Mr. Morgan's friends headed toward the house to go inside.
Mr. Morgan, however, walked across the street to his truck to
retrieve his MP3 player. Then, Mr. Morgan testified, as he was
starting to cross the street to go back to the house, he saw a
car approaching and moved quickly across the street "to
avoid from getting hit."[10] Mr. Morgan then entered through
the front gate into his cousin's yard and closed the gate be-
hind him. At that point, Mr. Morgan testified, he "heard a
loud screech" that "sounded like some brakes on the car" and
people yelling "[f]reeze" and telling him to open the gate.[11]
Mr. Morgan stated that he did not open the gate because he
was nervous and did not want to be involved with the police.
Mr. Morgan then walked on a gangway along the side of his
cousin's house, but, after progressing half of the way, turned
around and proceeded to walk back toward the front of the
house. At this point, a police officer drew his weapon and or-
dered Mr. Morgan to freeze. Mr. Morgan complied with the
officer's orders to lock his hands behind his head and lay flat
on the ground.

Mr. Morgan testified that another officer then jumped
over a chain-link fence and onto his head while he was lying
on the ground. He stated that he lost consciousness for several
seconds and, when he regained it, realized that his lip had
been cut and his two front teeth broken. The officers then
handcuffed Mr. Morgan, lifted him over the chain-link fence,
and placed him in the back of a police car. On the way to the

---

[10] *Id.* at 106.

[11] *Id.* at 108–09.

police station, Mr. Morgan testified, he was told he would be charged with possession of crack cocaine. After spending some time in a conference room at the police station, Mr. Morgan was taken to the hospital where he received four stitches in his upper lip and was informed that he had two fractured teeth. He was also given pain medication and ibuprofen.

Mr. Morgan testified that he was next transported to the county jail and placed in a holding cell. He then was taken to state court and released on bond. Three weeks later, Mr. Morgan stated, he returned to state court, and the charges were "dismissed by no probable cause."[12] Counsel for the defendants objected to this remark, and the court sustained the objection because the state court's finding of "no probable cause" to prosecute the possession charge was the subject of the defendants' pending motion in limine.[13]

Mr. Morgan then proceeded to call each of the three defendant officers to testify, and their descriptions of the encounter with Mr. Morgan differed from Mr. Morgan's testimony in several significant respects. Lt. DeVries testified that he was driving a police car accompanied by Sgt. Schulz and Sgt. Tsoukalas, heading southbound on the 7700 block of South Greenwood Avenue, when he saw Mr. Morgan standing at the rear side of a parked vehicle. According to Lt. DeVries, Mr. Morgan then "walked into the street in front of our vehicle … and immediately looked in my direction and grabbed his side" with his right hand.[14] Sgt. Tsoukalas, who

---

[12] *Id.* at 130.

[13] *Id.*; *see also* R.57 at 10.

[14] R.115-1 at 190–91.

was in the front passenger seat of the police car, and Sgt. Schulz, who was seated in the rear seat of the car, also testified that Mr. Morgan clutched his right side near his waistband as he crossed the street. Lt. DeVries testified that he believed, based on his experience, that Mr. Morgan had a weapon. Lt. DeVries stated that he sped up to thirty-five or forty miles per hour in order to catch up with Mr. Morgan and that Mr. Morgan then ran "full speed" into the yard through the front gate, which slammed shut behind him.[15] Lt. DeVries then exited the vehicle to pursue Mr. Morgan on foot; he tried to open the gate, but it was locked and, even after kicking the gate handle, would not open. Lt. DeVries testified that, from over a fence, he saw Mr. Morgan on the gangway next to the house, drew his weapon, and yelled at Mr. Morgan to show his hands. Sgt. Tsoukalas testified that as Mr. Morgan was raising his hands, a small plastic bag fell to the ground.

According to Lt. DeVries, as Mr. Morgan was complying with his commands, Sgt. Tsoukalas hopped over the chain-link fence and grabbed Mr. Morgan's right arm to handcuff him. Both Lt. DeVries and Sgt. Tsoukalas testified that at this point Mr. Morgan was not on the ground but was standing, that he lunged toward Sgt. Tsoukalas, and that Sgt. Tsoukalas then performed a "take-down" maneuver, which caused both men to fall "face first" to the ground.[16] Sgt. Schulz testified that he saw Sgt. Tsoukalas and Mr. Morgan falling to the ground and went to assist Sgt. Tsoukalas. At that point, Sgt. Schulz stated, he saw on the ground next to Mr. Morgan a clear plastic bag containing a white, rock-like substance that

---

[15] *Id.* at 194–95.

[16] *Id.* at 201–02, 300–01.

he believed to be crack cocaine. Lt. DeVries testified that he searched the area for a weapon but never found one.

During Sgt. Schulz's examination, the defendants' counsel sought to elicit testimony about the officer's familiarity with the location of Mr. Morgan's arrest and the "sorts of experiences [the officer had] had in that block."[17] Mr. Morgan's counsel objected, and the district court overruled, stating that "[w]hat the officers reasonably believed under the circumstances is relevant."[18] At a sidebar, Mr. Morgan's counsel argued that such testimony was irrelevant, prejudicial, and would be used by the jury to draw an impermissible propensity inference. The court again overruled the objection; it allowed Sgt. Schulz to testify as follows:

> Q. Sergeant, I think when we took that break I was asking you what your general knowledge or experience is relating to 7700 South Greenwood. So if you could please just tell the ladies and gentlemen of the jury?
>
> A. In my ten-plus years in the 6th District as a sergeant of police, my experiences with the block, numerous … narcotics calls, numerous men with a gun or person with a gun calls, foot chases, search warrants. Things of that nature.

---

[17] *Id.* at 382.

[18] *Id.*

Q. So it's fair to say that your previous experiences were relatively similar to the events that occurred on May 2nd, 2011, is that correct?

[Mr. Morgan's counsel]: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A.  Yes, sir.[19]

In addition to the three defendant officers, Mr. Morgan called another four witnesses as part of his case-in-chief. One of these witnesses was CPD Captain Ruth Wedster, the district watch commander on the night of the arrest. On cross-examination, Cpt. Wedster was asked about certain reports concerning Mr. Morgan's arrest. Cpt. Wedster testified initially that Captain Juan Morado had approved the reports, but, after reviewing the arrest report to refresh her recollection, she clarified that it was instead Sergeant Henry who had approved them. When counsel for the defendants asked Cpt. Wedster what Sgt. Henry had approved, she responded "[p]robable cause."[20] Mr. Morgan's counsel immediately objected and moved to strike based on the defendants' pending motion in limine, and the court sustained the objection and instructed the jury to "[d]isregard the last statement."[21]

At the conclusion of the evidence, the parties rested their cases and the court entertained several motions. Following ar-

---

[19] *Id*. at 384.

[20] *Id*. at 478–79.

[21] *Id*. at 479.

gument on the motions, the court directed the parties to confer before the next court date and then provide a set of agreed instructions and jury forms. When the court reconvened, the parties had reached agreement on roughly thirty instructions but had remaining disputes on another fifteen, and the court heard arguments on the disputed instructions. During argument, Mr. Morgan objected to one of the defendants' proposed instructions on the ground that it "was just proposed last night," to which the court responded, "you've … had months to work on this," and overruled the objection.[22]

After argument on the jury instructions, the parties presented their closing arguments. The court then instructed the jury on the applicable law and submitted Mr. Morgan's claims for decision. During the second day of deliberations, the jury sent a note asking whether, in the context of an investigatory stop, it is necessary for an officer to reasonably suspect an individual of "being connected with a crime or misdemeanor … having committed a crime or misdemeanor … having information regarding a crime or misdemeanor [or] … intending to commit a crime or misdemeanor[.]"[23] The parties submitted to the court an agreed-upon answer: "With respect to reasonable suspicion, you must find that the defendant … had reasonable suspicion that the plaintiff had committed or was about to commit a crime."[24] The court, however, believed that the response was not an accurate expression of the law and declined to give it,

---

[22] *Id*. at 551–52.

[23] *Id*. at 666.

[24] *Id*. at 667.

stating instead that it would give the following instruction:

> An investigative stop is a brief detention which gives police officers a chance to verify or dispel well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity. Permissible encounters between police officers and citizens are not limited to situations involving possible criminal activity, but also include situations in which persons may need help or are in danger of harming themselves or others.
>
> … In determining whether particular circumstances rise to the level of a reasonable suspicion, courts must look—must take into consideration the modes or patterns of operations of certain kinds of law-breakers which allow trained officers to draw inferences and make deductions that might well elude an untrained person.[25]

Mr. Morgan's counsel objected that the jury already had been instructed on reasonable suspicion and that the court's instruction "elaborates on things that aren't really pertinent to the question that the jury asked" and "goes far beyond what they have already been instructed on."[26] The court overruled the objection and gave its own response.

Ultimately, the jury returned a verdict for the defendants on all claims. Mr. Morgan then filed a motion for a new trial,

---

[25] *Id*. at 668.

[26] *Id*. at 670.

contending that (1) his right to equal protection had been violated by the defendants' racially motivated use of peremptory strikes, and (2) the court had committed multiple procedural and substantive errors that had deprived him of a fair trial. The district court denied Mr. Morgan's motion for a new trial, explaining that it found the defendants' rationale for the peremptory strikes to be "credible, honest, and race-neutral," and that the alleged errors did not, individually or cumulatively, render his trial unfair.[27]

Mr. Morgan now appeals the district court's decision, raising both of the arguments that he presented in his motion for a new trial.

# II

## DISCUSSION

### A. *Batson* Claim

It is well established that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection." *Batson*, 476 U.S. at 86. Indeed, the racially discriminatory exclusion of even one potential juror requires reversal. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). *Batson* has been extended to and applies identically in the civil context. *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 616 (1991); *Doe v. Burnham*, 6 F.3d 476, 481 (7th Cir. 1993).

When evaluating a *Batson* objection to a peremptory strike, the trial court engages in a three-step analysis. *Miller-El v.*

---

[27] R.108 at 6, 10.

*Cockrell* ("*Miller-El I*"), 537 U.S. 322, 328–29 (2003). First, it determines whether the strike's opponent has made a prima facie showing that the strike was exercised on the basis of race. *Id.* at 328; *see also United States v. Stephens* ("*Stephens I*"), 421 F.3d 503, 512 (7th Cir. 2005) ("[T]he burden at the *prima facie* stage is low, requiring only circumstances raising a suspicion that discrimination occurred."). If that showing has been made, the burden of production shifts to the strike's proponent to present a nondiscriminatory explanation for striking the juror. *Miller-El I*, 537 U.S. at 328. At this second step, nearly "any race-neutral reason" will suffice, "even if it is not a 'persuasive, or even plausible' reason." *Coulter v. McCann*, 484 F.3d 459, 465 (7th Cir. 2007) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Finally, at the third step, the trial court "weigh[s] the evidence and determine[s] whether the … nondiscriminatory reason for the strike is credible or if the [opponent of the strike] has shown purposeful discrimination." *Id*. At this step, the court evaluates the persuasiveness of the tendered race-neutral justification and decides whether it is genuine or pretextual. *See Miller-El v. Dretke*, ("*Miller-El II*"), 545 U.S. 231, 239–41 (2005).

The parties do not dispute that the first two steps of the *Batson* inquiry were satisfied here. The district court concluded that Mr. Morgan had met his limited burden of making a prima facie showing of racial motivation, and the defendants do not challenge this finding. Similarly, Mr. Morgan does not dispute the court's conclusion that the defendants provided a facially race-neutral justification for striking Jurors Seven and Nine, i.e., that both jurors lived near or had contacts with the block where Mr. Morgan was arrested. Con-

sequently, our focus is limited to the district court's determination that the defendants' race-neutral justification was genuine and not pretextual.

## 1.

In the third step of the *Batson* analysis, "the critical question … is the persuasiveness of the [race-neutral] justification for [the] peremptory strike," which "comes down to … credib[ility]." *Miller-El I*, 537 U.S. at 338–39. In order to assess counsel's credibility, the trial court must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotation marks omitted). Because this determination is inherently fact intensive, it "lies peculiarly within a trial judge's province" and, therefore, "represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York*, 500 U.S. 352, 364–65 (1991) (internal quotation marks omitted); *United States v. Taylor*, 509 F.3d 839, 845 (7th Cir. 2007) ("Only the district judge, who observed the voir dire firsthand, can make that determination in the first instance."). Accordingly, we will reverse under step three only if the court's findings on the issue of credibility are clearly erroneous. *Taylor*, 509 F.3d at 843.

Mr. Morgan contends that, in conducting the third step of the *Batson* inquiry, the district court erred in two ways. First, Mr. Morgan asserts that, as a procedural matter, the court erred by failing to hold a separate evidentiary hearing for the purpose of evaluating credibility. Second, Mr. Morgan chal-

lenges the court's credibility determination on the merits, arguing that the court clearly erred in finding that the defendants' proffered race-neutral justification was genuine.

### a. *Batson* Step Three Procedures
#### i. Necessity of Evidentiary Hearing

Mr. Morgan asserts that it was "procedurally improper" for the district court not to hold an evidentiary hearing on the issue of credibility.[28] Importantly, Mr. Morgan does not contend, and the voir dire transcript does not indicate, that, at the time he made his *Batson* objection, he requested and was denied the opportunity to present additional evidence of discriminatory motive. Rather, Mr. Morgan's argument is that, by failing to hold a hearing sua sponte at this juncture, the court necessarily committed reversible error.

Our case law does not support Mr. Morgan's position. At *Batson* step three, the opponent of a peremptory strike is permitted to "offer additional evidence to demonstrate that the proffered justification was pretextual." *Stephens I*, 421 F.3d at 510. However, recognizing both that the scope of the credibility inquiry is limited to an assessment of counsel's honesty and that "[t]here will seldom be much evidence bearing on [the credibility] issue," *Hernandez*, 500 U.S. at 365, we have held that "the procedures required in assessing counsel's motive are limited as well," *Lamon v. Boatwright*, 467 F.3d 1097, 1101–02 (7th Cir. 2006); *see also Batson*, 476 U.S. at 99 (expressly declining to "formulate particular procedures to be followed" after a *Batson* objection). We therefore do not require that trial

---

[28] Appellant's Br. 20.

courts employ "evidentiary proceedings which would be unlikely to produce evidence bearing on counsel's credibility." *Lamon*, 467 F.3d at 1102 (affirming denial of request to "call stricken panelists as witnesses and question them during a *Batson* hearing" because it "would not have shed light on whether the prosecutor *honestly believed*" the race-neutral reason (emphasis in original)); *Williams v. Chrans*, 957 F.2d 487, 491 (7th Cir. 1992) (same).[29]

Here, Mr. Morgan "had the opportunity to discredit" the defendants after they had provided their race-neutral justification. *Lamon*, 467 F.3d at 1102. Because he did not offer any additional evidence that would have necessitated a separate credibility hearing—and because the district court was under no affirmative obligation to conduct one in the absence of such a request—there was no procedural error under *Batson*'s third step.

### ii.   Necessity of Credibility Findings

Although our cases do not mandate an evidentiary hearing in all situations, the trial court is required to provide more than a conclusory estimation of counsel's credibility. *Batson*'s third step represents the culmination of a framework "designed to produce *actual answers* to suspicions and inferences that discrimination may have infected the jury selection process," *Johnson v. California*, 545 U.S. 162, 172 (2005) (emphasis

---

[29] *Cf. Davis v. Ayala*, 135 S. Ct. 2187, 2194, 2201 (2015) (rejecting argument that it was procedurally improper for trial court to conduct credibility determination "outside the presence of the defense" because "there [was] no reason to think that defense counsel could have pointed to" sufficient evidence to undermine the prosecutor's credibility).

added). Distinguishing the genuine from the racially pre-
textual constitutes the "decisive question" in the analysis.
*Hernandez*, 500 U.S. at 365. The trial court must, therefore, pro-
vide us with something to review. *Taylor*, 509 F.3d at 845
("Without the court's explanation for upholding the
strike … we have nothing to review."); *see also United States v.
Stephens* ("*Stephens II*"), 514 F.3d 703, 712 (7th Cir. 2008)
("[D]eference is due only when a district court properly per-
forms its task in the first instance."). Indeed, as our colleagues
on the First Circuit have recognized,

> [i]ndicating [credibility] findings on the record
> has several salutary effects. First, it fosters con-
> fidence in the administration of justice without
> racial animus. Second, it eases appellate review
> of a trial court's *Batson* ruling. Most im-
> portantly, it ensures that the trial court has in-
> deed made the crucial credibility determination
> that is afforded such great respect on appeal.

*United States v. Perez*, 35 F.3d 632, 636 (1st Cir. 1994).

There are two primary bases upon which a court may eval-
uate the genuineness of a proffered race-neutral justification.
First, a party may base its peremptory strike on subjective in-
dicators, most commonly the demeanor of the juror in ques-
tion. "Where the proffered race-neutral reason for a strike is
limited to the juror's demeanor," the trial court may rely on
the demeanor of the strike's proponent as well as "whether
the juror's demeanor can credibly be said to have exhibited
the basis for the strike." *United States v. Rutledge*, 648 F.3d 555,
559 (7th Cir. 2011) (quoting *Snyder*, 552 U.S. at 477); *see also
Hernandez*, 500 U.S. at 365 ("[T]he best evidence often will be
the demeanor of the attorney who exercises the challenge.").

Second, the trial court may consider additional, objective evidence introduced to "demonstrate that the proffered justification was pre-textual or to otherwise establish that the peremptory strike was motivated by a discriminatory purpose." *United States v. Corley*, 519 F.3d 716, 720–21 (7th Cir. 2008) (providing, as examples, evidence of a pattern of strikes against a particular racial minority, disparate questioning during voir dire, and comparative juror analysis); *see also Stephens II*, 514 F.3d at 711 ("Credibility may also be evaluated by considering the offering party's consistency in applying its non-discriminatory justification.").

When the stated basis for a strike is predicated on subjective evidence like the juror's demeanor, we typically have held that a trial court clearly errs by neglecting to state expressly its credibility findings on the record. For example, in *United States v. McMath*, 559 F.3d 657 (7th Cir. 2009), the defendant objected under *Batson* to the prosecution's exercise of a peremptory strike based on a juror's facial expression, which "looked angry and not happy to be here," and the district court overruled the objection "without comment on the matter." *Id.* at 661, 663. Relying on the Supreme Court's decision in *Snyder v. Louisiana*, 552 U.S. 472 (2008), which held that a reviewing court cannot presume that the trial court credited a demeanor-based rationale where the trial court simply allowed the strike without explanation, we explained that the trial court's failure to assess explicitly counsel's motivation in striking the juror created a "void in the record that d[id] not allow us to affirm the denial." *Id.* at 666. We held, therefore, "that the district court clearly erred in denying the *Batson* challenge without making findings regarding the credibility of the proffered race-neutral justification for the strike," and we remanded the case for further findings. *Id.*; *see also Snyder*,

552 U.S. at 477 (noting that, particularly where the stated basis for a strike "invoke[s] a juror's demeanor (e.g., nervousness, inattention), … the trial court's firsthand observations [are] of even greater importance"); *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 521 (6th Cir. 2001) ("The need for an explicit, on-the-record analysis of each of the elements of a *Batson* challenge is especially important when the purported race-neutral justification is predicated on subjective explanations like body language or demeanor.").[30]

Where the trial court was presented objective, non-demeanor evidence that the stated rationale for a strike was illegitimate, our earlier cases exhibited an analysis tailored to the record before us. For example, in *United States v. Corley*, 519 F.3d 716 (7th Cir. 2008), the prosecution presented a nondiscriminatory basis for striking a juror, and the defendant argued in response "that similarly-situated white jurors were treated differently." *Id.* at 722. The trial court allowed the peremptory strike but failed to articulate its reasoning. *Id.* at 722–23. Affirming, we explained that

> [a]lthough it would be more helpful for the district courts in these *Batson* cases to explicitly make credibility determinations, and perhaps state on the record the basis for rejecting the

---

[30] As the Fifth Circuit has noted, "[t]he circuits have disagreed on the extent to which *Snyder* imposes an affirmative duty on the district court to make record findings where the prosecutor has offered only a demeanor-based justification." *United States v. Thompson*, 735 F.3d 291, 300 (5th Cir. 2013) (surveying circuit split and agreeing with Eleventh Circuit's approach "that *Snyder* does not require a district court to make record findings of a juror's demeanor where the prosecutor justifies the strike based on demeanor alone").

> comparisons with similarly-situated jurors, there is no ambiguity in this record. The court accepted the government's argument, that determination is supported by the record, and it is not clearly erroneous.

*Id.* at 723; *see also U.S. Xpress Enters., Inc. v. J.B. Hunt Transp., Inc.*, 320 F.3d 809, 814 (8th Cir. 2003) ("[T]he record adequately discloses a full *Batson* analysis, and we find that the failure of the trial judge to articulate his analysis of step three on the record did not constitute clear error."). In *United States v. Taylor*, 509 F.3d 839 (7th Cir. 2007), on the other hand, we reached the opposite conclusion. In that case, we observed that "the defendants ha[d] made a strong case," based on comparative evidence, that the Government had exercised its peremptory strike on a racially discriminatory basis. *Id.* at 845. Nevertheless, because the record was "silent as to the district court's rationale for denying defendants' *Batson* challenge," we remanded the case "for the limited purpose of supplementing the record with [the court's] findings about whether the government's stated reason for exercising a peremptory challenge … [was] credible." *Id.* at 845–46.

Our recent decision in *United States v. Rutledge*, 648 F.3d 555 (7th Cir. 2011), made clear that, at bottom, we have a core concern in all third-prong *Batson* situations, no matter what their particular circumstances. In *Rutledge*, the defendant raised *Batson* objections to the prosecution's peremptory strikes of two African-American venirepersons, and the prosecution offered two distinct race-neutral justifications. The prosecution's reason for striking the first prospective juror was that she exhibited an "agitated" and "frustrated" dispo-

sition during voir dire; defense counsel disputed this de-
meanor-based rationale. *Id.* at 557. As to the second prospec-
tive juror, the prosecution explained that the panelist had ex-
pressed his own personal concern about being racially stere-
otyped by other jurors, and defense counsel challenged this
rationale as pretextual. *Id.* The district court overruled both
*Batson* objections but failed to articulate its credibility deter-
minations for either. *Id.* at 558.

Addressing the demeanor-based strike first, we explained,
building on *McMath*, that

> [t]he trial court must evaluate not only whether
> the prosecutor's demeanor belies a discrimina-
> tory intent, but also whether the juror's de-
> meanor can credibly be said to have exhibited
> the basis for the strike attributed to the juror by
> the prosecutor. These findings must be explicit;
> without them there is a void that stymies appel-
> late review, gives us no finding of fact to which
> we might defer, and ultimately precludes us
> from affirming the denial of the *Batson* chal-
> lenge.

*Id.* at 560 (citations omitted) (internal quotation marks omit-
ted). We then applied this reasoning "with equal force" to the
non-demeanor-based second strike, explaining that in such
cases it was likewise "essential" that the trial court make an
express credibility determination. *Id.* at 561. In both situa-
tions, we explained,

> if there is nothing in the record reflecting the
> trial court's decision, then there is nothing to
> which we can defer. That is why the third step

> under *Batson requires* the court to weigh the evidence and determine whether the prosecution's nondiscriminatory reason for the strike is credible or if the defense has shown purposeful discrimination.

*Id.* at 559 (emphasis in original) (citations omitted) (internal quotation marks omitted). We therefore "conclude[d] that a remand [was] necessary for the district court to make explicit credibility findings for both jurors." *Id.* at 560.

Given the "pivotal role" that the trial court's credibility determination plays in the proper functioning of the *Batson* framework, *Snyder*, 552 U.S. at 477, trial courts should state fully their credibility determinations on the record so that such findings may receive the substantial deference to which they are entitled. Otherwise, "when we confront an evidentiary gap at step three," we generally will not resolve the *Batson* issue without first remanding the case to "find out what the district court perceived." *Rutledge*, 648 F.3d at 560 (internal quotation marks omitted).

Here, the district court, in its order denying a new trial, considered explicitly and in detail the genuineness of the defendants' proffered nondiscriminatory rationale—familiarity with the block where Mr. Morgan was arrested. Specifically, the court compared Jurors Nine and Seven, the jurors struck by the defendants, to "similarly-situated jurors who were permitted to serve on the" jury.[31] Jurors Six and Nineteen, the court explained, were African-Americans who did not live ge-

---

[31] R.108 at 5–6.

ographically close to the location of the arrest and were se-
lected for the jury without challenge. Moreover, the remain-
ing potential jurors all either "lived outside Chicago in vari-
ous suburban municipalities" or lived in the city but "gave no
indication that they were familiar [with] the area where the
incident occurred."[32] The court therefore determined that the
defendants' proffered rationale "only applied to the two pan-
elists that were stricken."[33] Consequently, it found "no evi-
dence tending to prove purposeful discrimination," and it
concluded "that Defendants' reasons for its peremptory
strikes, at the time they were initially challenged [were] cred-
ible, honest, and race-neutral."[34] We are satisfied that the
court's analysis provides ample basis for us to afford signifi-
cant deference to its credibility determination.

Notably, the district court's explanation came in its denial
of Mr. Morgan's motion for a new trial rather than during voir
dire. At the time Mr. Morgan raised his *Batson* objections, the
court said only that "[t]he defendants have already stated a
race-neutral basis for exercising the peremptory chal-
lenge … which is familiarity with the neighborhood and hav-
ing friends there. So I think that is a sufficient showing of a
non-discriminatory basis for the peremptory challenge."[35] It
was not until Mr. Morgan filed a motion for a new trial that

---

[32] *Id*. at 6.

[33] *Id*.

[34] *Id*.

[35] R.115-1 at 51.

the court actually articulated in full its rationale for finding the race-neutral justification credible.

We have not confronted this situation before. However, the Sixth Circuit has held, on similar facts to the present case, that a trial court's posttrial articulation of its credibility determination is sufficient. In *McCurdy v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001), the district court, during voir dire, denied the plaintiff's *Batson* challenge without comment. 240 F.3d at 520. In his motion for a new trial, the plaintiff restated his *Batson* objection, and the court, in denying the motion, explained that it agreed with the race-neutral justification that had been provided at the time of the peremptory strike. *Id.* at 521. Upon review, the Sixth Circuit "underscore[d] that the district court's initial reaction to [the plaintiff]'s *Batson* claim, in which it perfunctorily accepted the County's race-neutral explanation, did not conform to the requirement that the district court make expressed findings on each of the elements of a *Batson* claim." *Id.* at 521–22 (citation omitted). Nevertheless, it held that because the court had "ultimately engaged in the constitutionally required analysis," it was appropriate to defer to its *Batson* findings. *Id.* at 522; *see also United States v. Cecil*, 615 F.3d 678, 686 (6th Cir. 2010) (applying *McCurdy* where the district court initially denied *Batson* challenge in perfunctory manner but went on to "hear[] additional argument and ma[ke] its own findings with respect to the plausibility of the government's explanation").

The approach of our colleagues in the Sixth Circuit to the situation we now confront is, we note, compatible with our usual approach in cases where on-the-record credibility findings are lacking; we remand the case and allow the trial court

to supplement the record.[36] Because we are concerned solely with the *substance* of the trial court's credibility determination, the timing of the explanation for its decision does not bear on its adequacy.[37] Nevertheless, we think it highly preferable that a trial court place its credibility analysis on the record at the time it initially rules on the objection. We therefore agree with the Sixth Circuit that a trial court's explanation in disposing of a posttrial motion is sufficient in the situation before us.

---

[36] *See United States v. Rutledge*, 648 F.3d 555, 557 (7th Cir. 2011) (remanding based on district court's denial of a *Batson* challenge "without making any finding on the prosecutor's credibility"); *United States v. McMath*, 559 F.3d 657, 666 (7th Cir. 2009) (remanding based on district court's "summary denial" of *Batson* challenge in which it made no credibility findings); *United States v. Taylor*, 509 F.3d 839, 845 (7th Cir. 2007) (remanding the case "for the limited purpose of supplementing the record with" the district court's credibility findings).

[37] Indeed, in the habeas context we have been willing to remand cases based on inadequacies in the trial court's *Batson* analysis decades after jury selection. *See, e.g., Hooper v. Ryan*, 729 F.3d 782, 787 (7th Cir. 2013) (remanding for a credibility determination although "[i]t seems unlikely that this can be done 32 years after the trial"); *Harris v. Hardy*, 680 F.3d 942, 965–66 (7th Cir. 2012) (remanding and noting that although "[w]e are well aware that the crimes with which Harris was charged occurred almost 30 years ago … the passage of time is not a basis for overlooking the prosecutors' violations of the Equal Protection Clause" (internal quotation marks omitted)); *Jordan v. Lefevre*, 206 F.3d 196, 202 (2d Cir. 2000) ("We therefore direct the district court to, in its discretion, hold a hearing to reconstruct the prosecutor's state of mind at the time of jury selection, or if the passage of nine years since Jordan's trial and other circumstances should have made such a determination impossible or unsatisfactory, to order that the state grant Jordan a new trial.").

In sum, we are convinced that the district court in this case fulfilled its responsibilities under the *Batson* framework; we therefore review its credibility determination under the familiar clear error standard.

### b. Substantive Credibility Determination

Mr. Morgan contends that the district court clearly erred[38] in finding that the defendants' race-neutral explanation for striking Jurors Seven and Nine was "honest and credible" and "not pretext for discrimination."[39] In Mr. Morgan's view, this determination was clearly erroneous because: (1) the defendants' proffered nondiscriminatory rationale is inherently or presumptively pretextual based on its racially disproportionate impact, and (2) the defendants' differential treatment of prospective jurors during voir dire provides sufficient evidence of their racially discriminatory purpose. We address these contentions in turn, keeping in mind that "the ultimate

---

[38] In his brief, Mr. Morgan urges that "[t]he standard of review is de novo as at the time of the strikes the District Court never made a record as to the credibility of the defendants' justifications." Appellant's Br. 7. The Supreme Court has explained, however, that the credibility determination is a "pure issue of fact," *Hernandez v. New York*, 500 U.S. 352, 364 (1991), and deference is "necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations," *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 339 (2003). This rationale for appellate deference applies with equal force whether the trial court made its credibility determination at the time of the objection or, as here, in a posttrial order.

[39] R.108 at 5.

burden of persuasion regarding racial motivation rests with, and never shifts from," Mr. Morgan. *Purkett*, 514 U.S. at 768.

### i. Discriminatory Impact

Mr. Morgan first contends that the race-neutral basis for the defendants' peremptory strikes—familiarity with the location of Mr. Morgan's arrest—is inherently pretextual because "the practical reality is this rationale would effectively mean that Defendants would only strike African-American venirepersons due to the demographics of the South Side of Chicago."[40]

At the outset, we note that Mr. Morgan's position is difficult to maintain in light of the Supreme Court's pronouncement that disparate racial impact, although relevant, is alone insufficient to establish purposeful discrimination under *Batson*. *Hernandez*, 500 U.S. at 359–60. Rather, "[p]roof of racially discriminatory intent or purpose is required." *Id.* (internal quotation marks omitted).[41] Acknowledging this principle,

---

[40] Appellant's Br. 10.

[41] We note that some *Batson* claims involve the presentation of statistical evidence concerning a party's use of peremptory challenges as a means through which the court may infer discriminatory intent. *See, e.g.*, *Hernandez*, 500 U.S. at 363 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another." (alterations in original) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))); *Harris*, 680 F.3d at 951; *see also Miller-El I*, 537 U.S. at 342 ("In this case, the statistical evidence alone raises some debate as to whether the

Mr. Morgan invites our attention to *United States v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990). In *Briscoe,* an African-American venireperson testified on voir dire "that during the last five years he had resided at three different addresses on the west side of Chicago." 896 F.2d at 1488. The Government sought to peremptorily strike the panelist, arguing that all three addresses were "geographically close" to the addresses of two individuals scheduled to testify in the case and that it would impair the Government's interests to "allow[] a juror who somehow may be personally familiar with, if not the people involved, certainly the area involved where these events have taken place." *Id.* (internal quotation marks omitted). The district court found this justification to be credible, and we affirmed. *Id.* In doing so, we noted our "cognizan[ce] of the fact that the west side of Chicago is predominantly black and that exclusion of jurors based solely on their residence in this area of the city could be a pretext for discrimination." *Id*. We held, however, that the Government's explanation had gone "well beyond a cursory statement that [the potential juror] resided on the west side of Chicago" and had in fact "explicitly stated" that his last three residences were "geographically close to the addresses of" the scheduled witnesses. *Id.* at 1488–89.

Mr. Morgan points to our brief aside in *Briscoe* that the "exclusion of jurors based solely on their residence … *could* be a pretext for discrimination." *Id.* at 1488 (emphasis added). This

---

prosecution acted with a race-based reason when striking prospective jurors."). Mr. Morgan has not provided any such empirical basis for his argument.

language, he argues, places a heightened burden on "attorney[s] using residence as a rationale for striking a venireperson" and, in this context at least, permits an inference of racial motivation unless counsel provides a "juror specific" basis for the strike.[42] We cannot accept Mr. Morgan's interpretation. In *Briscoe*, we recognized that the Government had a genuine interest in removing venirepersons "personally familiar with, if not the people involved, certainly the area involved." 896 F.2d at 1488. "[I]t is quite likely," we said, "that [the potential juror] might very well have been familiar with, if not [the witness] herself, the individuals involved … thus justifying the government's peremptory challenge." *Id.* We therefore concluded that the district court correctly accepted the Government's stated basis for striking the juror. We said nothing in *Briscoe*, however, of imposing a heightened burden on parties seeking to remove a venireperson on the basis of residency, nor could we have, as such a burden would go inappropriately to the accuracy of the rationale rather than the genuineness of the motive.

The district court in this case found that the defendants' proffered race-neutral reason, like the Government's in *Briscoe*, "went well beyond a cursory statement" concerning the prospective jurors' residency, and, therefore, was "honest and credible."[43] There is certainly an adequate basis for that finding. When Juror Nine was asked during voir dire whether she

---

[42] Appellant's Br. 11.

[43] R.108 at 5 (quoting *United States v. Briscoe*, 896 F.3d 1476, 1488–89 (7th Cir. 1990)).

was familiar with the location of Mr. Morgan's arrest, she responded, "Yes, I am. … I live not far away."[44] To the same question, Juror Seven also answered in the affirmative, adding that she had "a couple of friends that live in that area."[45] The record shows that Mr. Morgan's pretrial witness list included three individuals who were with him at 7746 South Greenwood Avenue at the time of his arrest, two of whom lived within a block of that address.[46] Given their answers, and the limited area occupied by a single city block, a significant possibility existed that one or both of the prospective jurors "might very well have been familiar with, if not [the witnesses themselves], the individuals involved" in Mr. Morgan's arrest. *Briscoe*, 896 F.2d at 1488; *see also Dunham v. Frank's Nursery & Crafts, Inc.*, 967 F.2d 1121, 1126 (7th Cir. 1992) (affirming denial of *Batson* challenge because "there was at least the potential that [the prospective juror] may have been a friend of a friend of the Plaintiffs" (internal quotation marks omitted)).[47] Indeed, it was this precise concern that counsel for

---

[44] R.115-1 at 44.

[45] *Id.* at 45.

[46] R.56 at 13–14.

[47] Mr. Morgan takes issue with defense counsel's failure to inquire to greater depth the extent of the two prospective jurors' familiarity with the area. Appellant's Br. 14–15. In light of the already apparent potential for juror bias, however, we see no reason to attach analytical significance to counsel's failure to pursue this line of questioning further. *Cf. United States v. Brown*, 809 F.3d 371, 375 (7th Cir. 2016) (expressing "skeptic[ism] as to whether the failure to ask a follow-up question … suggests pretext").

the defendants "explicitly stated," *Briscoe*, 896 F.2d at 1489, to the district court:

> I think this case should be decided by people that have no familiarity with the area or may have contacts in any way.
>
> The evidence is going to show that the plaintiff has a number of friends in that area, and they were present. They were there, and [Juror Nine] lives in that particular area, [and] may have some knowledge through others of this particular incident.[48]

Finally, we note that although familiarity with the block may not have been sufficient to justify removing these prospective jurors for cause—indeed, the district court rejected this rationale as "not enough to support a challenge for cause"[49]—"[u]nlike a challenge for cause, a peremptory strike need not be based on a strong or good reason, only founded on a reason other than race." *United States v. Smallwood*, 188 F.3d 905, 915 (7th Cir. 1999) (internal quotation marks omitted); *accord Batson*, 476 U.S. at 97 ("[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.").

---

[48] R.115-1 at 49; *see also id.* at 50 (providing the same reason for striking Juror Seven).

[49] *Id.* at 49; *see also id.* at 50 (denying challenge for cause of Juror Seven because "she hasn't indicated that she knows any people particularly involved in the case" and "it is not enough to support a challenge for cause based upon familiarity with the area").

### ii. Differential Treatment

Mr. Morgan next contends that differences in the defend-ants' treatment of prospective jurors during jury selection es-tablishes that their facially neutral rationale for striking Jurors Seven and Nine was merely a pretext for race. At *Batson* step three, "[a]n opponent of a strike may rely on all relevant cir-cumstances to raise an inference of purposeful discrimina-tion." *Harris v. Hardy*, 680 F.3d 942, 949 (7th Cir. 2012) (inter-nal quotation marks omitted); *see also Miller-El I*, 537 U.S. at 339 ("Credibility can be measured by, among other factors, [counsel's] demeanor; by how reasonable, or how improba-ble, the explanations are; and by whether the proffered ra-tionale has some basis in accepted trial strategy."). For exam-ple, a pattern of differential questioning can show discrimina-tory intent when it indicates an effort to elicit disqualifying answers from minority venirepersons. *Miller-El II*, 545 U.S. at 255–60. Similarly, a "comparative juror analysis" showing that the purported reason for striking African-American pro-spective jurors was not equally applied to non-African-Amer-icans can constitute evidence of pretext. *Harris*, 680 F.3d at 953. Here, Mr. Morgan offers a litany of discrete comparisons that he claims demonstrate the defendants' underlying racial motive during jury selection.[50] Upon review of the record,

---

[50] We note that several of Mr. Morgan's specific arguments concerning differential questioning were not included in his motion for a new trial before the district court and have been raised for the first time on appeal. The defendants, however, do not argue waiver; they address each of Mr. Morgan's contentions on the merits. Accordingly, the defendants have waived their waiver arguments, and we will address Mr. Morgan's

however, we do not believe these examples are indicative of purposeful discrimination.

Mr. Morgan first asserts that the defendants "target[ed]" African-American venirepersons for questioning during voir dire.[51] As evidence, Mr. Morgan relies on questions asked only to Jurors Six and Nineteen, the two African-American prospective jurors who were eventually seated on the jury. To Juror Six, counsel for the defendants asked several questions regarding her level of education. To Juror Nineteen, counsel asked whether her children were in school or employed; when Juror Nineteen responded that her children were all of adult age, counsel then pursued a line of questioning concerning their employment and education.

We do not believe that these questions, when considered in context, betray a discriminatory motive on the part of the defendants. Counsel's questions to Juror Six regarding her education were posed in response to the prospective juror's statement that she worked with "medical information" as a data entry clerk.[52] Defense counsel emphasized medical training and experience throughout voir dire, even peremptorily striking a physical therapist; and Mr. Morgan's medical records were in fact introduced at trial and discussed extensively during closing arguments. As to Juror Nineteen, although it is true that defense counsel did not question other venireper-

---

new arguments on the merits. *See Riemer v. Illinois Dep't of Transp.*, 148 F.3d 800, 804 n.4 (7th Cir. 1998).

[51] Appellant's Br. 13.

[52] R.115-1 at 36–37.

sons to this degree of depth about their children, Juror Nineteen was the only prospective juror who made clear during voir dire that her children were of adult age. Without anything more, we decline to attribute invidious intent to the defendants based solely on this line of questioning. Finally, we note that despite this additional probing, both Jurors Six and Nineteen were ultimately seated on the jury. *See United States v. Cruse*, 805 F.3d 795, 808 (7th Cir. 2015) ("[T]he fact that two black jurors remained on the jury … is a valid (if not dispositive) factor.").

Mr. Morgan also invites our attention to the defendants' questioning of Jurors Nine and Seven regarding their familiarity with the location of the arrest, while Juror Twelve, a non-African-American[53] individual also from Chicago, was not similarly questioned. *See Miller-El II*, 545 U.S. at 241 ("If a [party]'s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). Again, however, we find this difference unremarkable when examined in context. Juror Twelve had revealed that his cousin formerly served as Corporation Counsel for the City of Chicago. Both parties' questioning of Juror Twelve focused on this fact. Given the Corporation Counsel's involvement in this case, we see no reason to infer pretext from the defendants' failure to pursue other lines of questioning. *See Brown*, 809 F.3d at 375

---

[53] The racial composition of the venire was not stated on the record in the district court, but the parties appear to agree that Juror Twelve was not African-American.

(indicating "skeptic[ism] as to whether the failure to ask a follow-up question … suggests pretext" where the circumstances of jury selection implied "that the government did not want to interrupt the flow of the proceeding, not that it was trying to deceive the court").

Finally, Mr. Morgan contrasts the defendants' peremptory strike of Juror Seven, a security guard who "should have been an ideal juror for defendants," with their "significant effort to rehabilitate" Juror Five,[54] a white female who stated during voir dire that she was friends with a police officer who had told her stories about "people in Chicago of color."[55] The record will not support this argument. As we discussed previously, the defendants provided a race-neutral explanation for striking Juror Seven—her familiarity with the 7700 block of South Greenwood Avenue. With regard to Juror Five, after Mr. Morgan challenged her for cause, the district court asked defense counsel for a response, to which counsel replied, "Judge, I think she indicated that despite what, she, you know, has learned through her friend, she could be fair and impartial to both sides in this particular case."[56] This is hardly an "adamant defense" or a "significant effort to rehabilitate."[57]

---

[54] Appellant's Br. 17–19.

[55] R.115-1 at 36.

[56] *Id.* at 48.

[57] Appellant's Br. 17, 19.

We are satisfied that nothing in the voir dire record suggests that the defendants' facially race-neutral reason for striking Jurors Seven and Nine was a pretext for race.

## B. Trial Fairness

In addition to his *Batson* claim, Mr. Morgan also moved for a new trial on the basis of what he believed to be seven distinct errors committed by the district court. Mr. Morgan now raises for our review only five of these issues.[58] We review the district court's denial of Mr. Morgan's motion for a new trial for abuse of discretion. *Christmas v. City of Chicago*, 682 F.3d 632, 639 (7th Cir. 2012). We will reverse only if Mr. Morgan can establish that the errors he alleges rendered his trial unfair. *See id.*

### 1. Pretrial Matters

Mr. Morgan first contends that he was denied a fair trial because, after the parties filed a joint pretrial order along with several dozen motions in limine, the district court failed either

---

[58] The district court found that Mr. Morgan had waived four of the seven alleged trial errors by failing to provide supporting authority and therefore declined to address them. "Ordinarily, arguments not made in the district court are waived on appeal." *Riemer*, 148 F.3d at 804 n.4. However, the defendants again have not argued that Mr. Morgan waived these issues by failing to develop them in the district court; rather, the defendants address each of the five errors set forth in Mr. Morgan's opening brief. We therefore address these issues on their merits. *See id.*; *supra* note 50.

to hold a pretrial conference or to rule on the pending motions; the court instead chose to rule on the motions "during the course of the trial … as they are made."[59] Mr. Morgan argues that, in doing so, the court "created the expectation in the parties that its subsequent failure to address resulted in prejudice."[60]

There is no requirement that a district court hold a pretrial conference, *see* Fed. R. Civ. P. 16(a), and courts have "broad powers to determine the proper method of preparing a case for trial," *Mizwicki v. Helwig*, 196 F.3d 828, 833 (7th Cir. 1999) (noting that a "court's discretionary order should not be disturbed on review unless it is clear that no reasonable person would rule as the district court judge did"). We see no basis in the record for questioning the court's decision to forego a pretrial conference. With regard to the court's deferral of its motions in limine rulings until trial, we cannot accept Mr. Morgan's argument that this decision created an atmosphere of "trial by surprise."[61] Indeed, a district court has continuing discretion throughout the proceedings to alter earlier rulings even when it rules on motions in limine before trial. *See Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013). The district court's resolution of these pretrial issues fits comfortably within its broad discretion on such matters and did not render Mr. Morgan's trial unfair.

---

[59] R.115-1 at 3–4.

[60] Appellant's Br. 27.

[61] *Id.* at 28.

### 2. Evidentiary Rulings

Mr. Morgan asks us to review two of the district court's evidentiary rulings. These rulings are entitled to "special deference," and we will reverse only for an abuse of discretion. *United States v. Faruki*, 803 F.3d 847, 854 (7th Cir. 2015) (quoting *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003)).

#### a.

Mr. Morgan first asserts that the district court abused its discretion in allowing testimony regarding "the criminal character of the neighborhood" in which Mr. Morgan was arrested.[62] During trial, defense counsel sought to elicit testimony from one of the defendant officers, Sgt. Schulz, about his familiarity with the location of Mr. Morgan's arrest and the "sorts of experiences [the officer had] had in that block."[63] Mr. Morgan's counsel objected, and the district court overruled, stating that "[w]hat the officers reasonably believed under the circumstances is relevant."[64] At a sidebar, Mr. Morgan's counsel argued that such testimony was irrelevant, prejudicial, and would be used by the jury to draw an impermissible propensity inference. The court again overruled the objection and allowed Sgt. Schulz to testify as follows:

> Q. Sergeant, I think when we took that break I was asking you what your general knowledge

---

[62] *Id.* at 25.

[63] R.115-1 at 382.

[64] *Id.*

or experience is relating to 7700 South Green-wood. So if you could please just tell the ladies and gentlemen of the jury?

A. In my ten-plus years in the 6th District as a sergeant of police, my experiences with the block, numerous … narcotics calls, numerous men with a gun or person with a gun calls, foot chases, search warrants. Things of that nature.

Q. So it's fair to say that your previous experiences were relatively similar to the events that occurred on May 2nd, 2011, is that correct?

[Mr. Morgan's counsel]: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. Yes, sir.[65]

Because his brief does not cite specific rules of evidence, it is not clear whether Mr. Morgan believes that the district court should have excluded Sgt. Schulz's testimony under Federal Rule of Evidence 403, 404, or both. We need not define the precise contours of Mr. Morgan's argument, however, because we conclude that the officer's testimony was admissible under both Rules 403 and 404.[66]

---

[65] *Id.* at 384.

[66] *Cf. United States v. Faruki*, 803 F.3d 847, 855 (7th Cir. 2015) (noting appellant's argument that evidence "was unduly prejudicial because [it] implicate[d] propensity evidence concerns" but limiting its analysis to Rule 403 framework because appellant "d[id] not make an explicit Rule 404 argument").

Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. Here, Sgt. Schulz's testimony about his own decade of experience policing the block in which Mr. Morgan was arrested had clear probative value in understanding the officer's evaluation of the specific facts available to him at the time of the encounter with Mr. Morgan. *See, e.g.*, *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005) ("Police officers are entitled to make assessments of situations 'in light [of their] specialized training and familiarity with customs of the area's inhabitants.'" (alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 276 (2002))); *see also United States v. Flood*, 965 F.2d 505, 510–11 (7th Cir. 1992) ("In establishing that probable cause existed for an arrest or a search, law-enforcement officers commonly testify that their experience indicates a certain behavior pattern or a particular combination of circumstances is indicative of—as opposed to proof of—criminal activity.").

The question before us then is whether the court's admission of Sgt. Schulz's testimony unfairly prejudiced Mr. Morgan. "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *United States v. Loughry*, 660 F.3d 965, 974 (7th Cir. 2011). The district court did not abuse its discretion in determining that Sgt. Schulz's testimony would not have such an effect here; there was nothing "inherently emotional or incendiary" about the officer's summation of his own experiences policing the block. *United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007). By contrast, this information was central to evaluating the lawfulness of the stop under the Fourth Amendment. *See Venson v. Altamirano*, 749

F.3d 641, 656 (7th Cir. 2014) (holding officer's testimony regarding experience in neighborhood not prejudicial "to the extent it addressed how [the arresting officers] would have perceived Venson's behavior at the time of his arrest").

Similarly, Sgt. Schulz's testimony certainly did not constitute impermissible character evidence. Rule 404(a) "establishes the general proposition that evidence of a person's character or a trait of a character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." *United States v. Smith*, 230 F.3d 300, 307 (7th Cir. 2000). This prohibition, however, applies only to "evidence … offered 'to prove that on a particular occasion the person acted in accordance with the character or trait.'" *United States v. Volpendesto*, 746 F.3d 273, 293 (7th Cir. 2014) (quoting Fed. R. Evid. 404(a)(1)). Here, Sgt. Schulz's testimony was not offered to establish that Mr. Morgan was acting in conformity with a personal character trait. Instead, it was introduced so that the jurors would understand the legally relevant experience through which the officer would have filtered the facts available at the time he encountered Mr. Morgan. *See id.* (holding that testimony was not propensity evidence because it was introduced to show "subjective state of mind").

### b.

Mr. Morgan also submits that the district court permitted the defendants to "intentionally violate[] their own motion *in limine* … regarding probable cause," thereby depriving him

of a fair trial.[67] Prior to trial, the defendants filed a motion in limine requesting that the district court bar evidence that the state court had found "no probable cause" to prosecute Mr. Morgan on the charge of possession of a controlled substance.[68] During trial, Mr. Morgan called the watch commander on the night of the arrest, CPD Cpt. Ruth Wedster, to testify. On cross-examination, Cpt. Wedster referenced "probable cause," and Mr. Morgan's counsel immediately objected on the ground that "probable cause" was the subject of defendants' pending motion in limine.[69] Mr. Morgan's counsel moved to strike Cpt. Wedster's statement, and the district court sustained the motion and instructed the jury to "disregard the last statement."[70] The court exercised sound judgment in its response to Mr. Morgan's objection. Nothing more was required. *See United States v. Bonner*, 302 F.3d 776, 782 (7th Cir. 2002) ("There is a very strong presumption that a jury has understood and followed the trial court's limiting instruction, erasing the improper influence that might have been caused by the stricken statement.").

### 3. Jury Instruction Matters

Mr. Morgan next urges that the district court committed multiple errors related to instructing the jury. First, he argues

---

[67] Appellant's Br. 29–30.

[68] R.57 at 10.

[69] R.115-1 at 478–79.

[70] *Id.*

that the court abused its discretion when it allowed the defendants to offer new jury instructions after the close of evidence. At the conclusion of trial, the court directed the parties to confer before the next court date and then provide a set of agreed instructions and jury forms. When the court reconvened, the parties had reached agreement on roughly thirty instructions but had remaining disputes on another fifteen, and the court heard arguments on the disputed instructions. During argument, Mr. Morgan objected to one of the defendants' proposed instructions on the ground that it "was just proposed last night," to which the court responded, "you've … had months to work on this," and overruled the objection.[71]

Mr. Morgan argues only that the defendants' proposed instruction was untimely under Federal Rule of Civil Procedure 51(a)(1), which states: "At the close of the evidence or at any earlier reasonable time that the court orders, a party may file and furnish to every other party written requests for the jury instructions it wants the court to give." Because the proposed instruction was submitted *after the close of evidence*, Mr. Morgan contends that the defendants were limited to "fil[ing] requests for instructions on issues that could not reasonably have been anticipated by an earlier time that the court set for requests." Fed. R. Civ. P. 51(a)(2)(A). Mr. Morgan's timeliness argument, however, ignores Rule 51(a)(2)(B), which allows a party, "with the court's permission," to submit "untimely requests for instructions on any issue." *Id.* 51(a)(2)(B). In any event, Mr. Morgan does not explain how the court's ruling caused him prejudice. *See Johnson v. General Bd. of Pension &*

---

[71] *Id.* at 551–52.

*Health Benefits of United Methodist Church*, 733 F.3d 722, 732 (7th Cir. 2013) (concluding that Rule 51(b) error was harmless where appellant "ha[d] not argued, let alone shown, that the … error caused her independent prejudice").

Mr. Morgan next asserts that the district court wrongly declined to give the parties' agreed upon response to a question posed by the jury. During the second day of jury deliberations, the jury sent a note asking whether, in the context of an investigatory stop, it is necessary for an officer to reasonably suspect an individual of "being connected with a crime or misdemeanor … having committed a crime or misdemeanor … having information regarding a crime or misdemeanor [or] … intending to commit a crime or misdemeanor[.]"[72] The parties submitted to the court an agreed-upon answer: "With respect to reasonable suspicion, you must find that the defendant … had reasonable suspicion that the plaintiff had committed or was about to commit a crime."[73] The court, however, believed that the response was not an accurate expression of the law and declined to give it. The court instead gave the following instruction:

> An investigative stop is a brief detention which gives police officers a chance to verify or dispel well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity. Permissible encounters between police officers and citizens are not limited to situations involving possible criminal activity, but also include

---

[72] *Id.* at 666.

[73] *Id.* at 667.

> situations in which persons may need help or are in danger of harming themselves or others.
>
> … In determining whether particular circumstances rise to the level of a reasonable suspicion, courts must look—must take into consideration the modes or patterns of operations of certain kinds of law-breakers which allow trained officers to draw inferences and make deductions that might well elude an untrained person.[74]

Mr. Morgan's counsel objected that the jury had already been instructed on reasonable suspicion and that the court's instruction "elaborates on things that aren't really pertinent to the question that the jury asked" and "goes far beyond what they have already been instructed on."[75] The court overruled the objection and gave its own response. In his brief, Mr. Morgan submits that the court's supplemental instruction "was overly broad, biased, and unnecessary" and that "[t]his was a close case."[76] We review the court's response to the jury's question for abuse of discretion. *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2005). In so doing, we ask: "(1) whether the instructions as a whole fairly and adequately treat the issues; (2) whether the supplemental instruction is a correct statement of the law; and (3) whether the district court answered the jury's questions specifically." *Id.* at 688.

---

[74] *Id.* at 668.

[75] *Id.* at 670.

[76] Appellant's Br. 33.

The district court's supplemental instruction accurately stated the law and addressed directly the jury's questions. When read in conjunction with the original jury instruction regarding investigatory stops and reasonable suspicion,[77] the court's response fairly and adequately treated the issue. We therefore conclude that the court did not abuse its discretion in giving its supplemental instruction in lieu of the parties' agreed upon response.

### 4. Cumulative Error

Finally, Mr. Morgan urges that the cumulative effect of the errors that he alleges deprived him of a fair trial. Because we believe that the district court exercised sound judgment in its rulings on all of these matters, we similarly conclude that Mr. Morgan's cumulative error argument is without

---

[77] The original instruction stated:

> An investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion. Police officers are justified in conducting a brief investigatory stop if an officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the stop.

> Reasonable suspicion is a common sense, nontechnical concept that deals with the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. It involves probabilities and does not always involve hard certainties, and therefore the totality of the circumstances must be taken into account. A reasonable, articulable suspicion requires more than a hunch but less than probable cause.

R.115-1 at 644–45.

merit. *See United States v. LeShore*, 543 F.3d 935, 942 (7th Cir. 2008).

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED