Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 24, 2017

**2017 CO 34**

**No. 14SC938, People v. Beauvais—Juries and Jury Selection—Peremptory Challenges—Batson Challenges.**

The supreme court considers whether a trial court must make express findings about the credibility of a party's reasons for exercising a peremptory challenge when the other party has challenged that strike under Batson v. Kentucky, 476 U.S. 79 (1986). The supreme court also considers when two or more jurors are similarly situated for comparison under Batson such that the dismissal of one but not the other indicates impermissible discrimination. The supreme court holds that although express credibility findings significantly aid appellate review, they are not strictly necessary if the trial court's ultimate Batson ruling is otherwise reviewable on the record. The supreme court also holds that appellate courts may rely on comparative juror analyses in reviewing Batson rulings, but only where the record facilitates comparison of the jurors in all respects that reportedly motivated the peremptory strike. The supreme court concludes that the record here supports the trial court's Batson ruling and that the trial court did not clearly err in denying defendant's Batson challenges. The supreme court reverses the judgment of the court of appeals in its entirety.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

**2017 CO 34**

---

**Supreme Court Case No. 14SC938**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA665

---

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Heather Beauvais.

---

**Judgment Reversed**
*en banc*
April 24, 2017

---

**Attorneys for Petitioner:**
Cynthia H. Coffman, Attorney General
Kevin E. McReynolds, Assistant Attorney General
  *Denver, Colorado*


**Attorney for Respondent:**
Michelle Lee Lazar
  *Denver, Colorado*


**Attorneys for Amicus Curiae Colorado Criminal Defense Bar:**
Colorado Criminal Defense Bar and University of Colorado School of Law
Margaret Ann England
Scott Adam Moss
  *Boulder, Colorado*

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents.

¶1   This case concerns the third step of the analysis laid out in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), which requires trial courts to determine whether a party raising a <u>Batson</u> objection proved by a preponderance of the evidence that opposing counsel exercised a peremptory challenge to excuse a potential juror on the basis of race or gender. Specifically, we consider whether the court of appeals erred in its review of the trial court's <u>Batson</u> ruling by: (1) remanding for specific credibility findings of the prosecution's non-demeanor-based reasons for its peremptory challenges, (2) refusing to credit the prosecution's demeanor-based reasons because the trial court did not expressly find them to be credible, and (3) conducting flawed comparative juror analyses.[1]

¶2   First, we hold that an appellate court conducting a clear error review should defer to a trial court's ultimate <u>Batson</u> ruling so long as the record reflects that the trial court weighed all of the pertinent circumstances and it supports the court's conclusion as to whether the objecting party proved purposeful discrimination by a preponderance of the

---

[1] We granted certiorari to review the following three issues:

1. Whether the court of appeals erred in applying <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), by remanding for additional findings where the trial court did not make express rulings on the credibility of the prosecution's proffered gender-neutral explanations for its peremptory challenges.

2. Whether the court of appeals erred by holding that, under <u>Snyder v. Louisiana</u>, 552 U.S. 472 (2008), a reviewing court cannot credit a demeanor-based explanation for a peremptory strike where the trial court did not expressly find the explanation to be credible.

3. Whether the court of appeals erred by applying comparative juror analysis to jurors dismissed by the defense before the prosecution accepted the panel, by comparing traits that defense counsel did not challenge, and by focusing on specific traits instead of consideration of all proffered reasons for striking each juror.

evidence. Second, we hold that a trial court's failure to make specific credibility findings about demeanor-based reasons does not—on its own—prevent a reviewing court from concluding that the trial court credited those reasons. Third, we hold that appellate courts may conduct comparative juror analyses despite an objecting party's failure to argue a comparison to the trial court, but only where the record facilitates a comparison of whether the jurors are similarly situated. An empaneled juror is similarly situated to a dismissed potential juror for the purposes of an appellate court's comparative juror analysis if the empaneled juror shares the same characteristics for which the striking party dismissed the potential juror.

¶3       We conclude that the trial court here did not commit clear error in step three of its Batson analysis and that remand is unnecessary. We therefore reverse the judgment of the court of appeals.

## I. Facts and Procedural History

¶4       The People charged Heather Beauvais with extortion and three counts of stalking in connection with her repeated attempts to contact a man whom she met on the internet. The matter proceeded to a jury trial. To begin jury selection, the court seated twenty-five potential jurors in the jury box and placed the remainder of the venire in the back of the courtroom in the order that they would be called to replace jurors who were later excused. During jury selection, potential jurors provided some basic information about their families, occupations, prior jury service, and connections to people working in law enforcement. The court informed the venire of applicable legal concepts, inquired about any hardships the jurors might suffer if selected to serve, and asked the jurors about their

willingness to take an oath to follow the law. The parties then conducted voir dire of the twenty-five jurors in the jury box. The parties agreed to excuse six potential jurors—three women and three men—for cause or hardship. As the court excused each person, the potential juror from the back of the courtroom who was next in order entered the jury box and assumed the excused juror's seat. The trial court asked each of these replacements to answer the initial background questions and then allowed the parties to question them.

¶5 After both sides passed the jurors for cause, the trial court gave each side the opportunity to exercise its peremptory challenges. Each party had six available peremptory challenges and, beginning with the prosecution, alternated as they excused jurors one by one.[2] The parties could only use a peremptory challenge on the first thirteen jurors seated in the box. When a party excused a potential juror using a peremptory challenge from the first thirteen positions, the next potential juror in line from the remaining jurors would assume that juror's number and seat. As a result, the parties knew who the replacement juror would be when they exercised a peremptory challenge. As the parties exercised each peremptory challenge, the court released the excused potential jurors from jury duty and allowed them to leave the courtroom.

¶6 The prosecution excused a total of five jurors, all of whom were women, while Beauvais excused six jurors, all of whom were men. The final jury consisted of nine male and three female jurors, with a female alternate juror. The record indicates that the last

_____

[2] Because the final jury was to consist of twelve jurors and a thirteenth alternate juror, each side was allowed the typical five peremptory challenges plus an extra, sixth challenge to achieve the desired number of jurors.

potential juror in the jury box, who was not empaneled because the prosecution did not exercise its final peremptory challenge, was also female.

¶7    Beauvais objected under <u>Batson</u> after the prosecution's third, fourth, and fifth uses of its peremptory challenges, arguing that the prosecution's decision to excuse only women established a prima facie case of discrimination. The trial court deferred ruling on the objections until both sides finished using their peremptory challenges. At that point, Beauvais highlighted that, although thirteen of the thirty-one potential jurors in the initial venire were women, only four would serve on the jury because the court had excused three for cause or hardship, the prosecution had peremptorily excused five, and one was never empaneled because the prosecution had waived its final challenge. Finally, Beauvais also argued that none of the excused women had given responses that would indicate a pro-defendant bias, while some had even given responses traditionally considered favorable to the prosecution.

¶8    The prosecutor began his response by admitting that it had been some time since he had encountered <u>Batson</u> and that he had "never heard it [argued] in terms of gender." He contended that, in any event, Beauvais had failed to make a prima facie showing of discrimination that would warrant a full <u>Batson</u> analysis because four women (including the alternate) remained on the jury.

¶9    The trial court disagreed. Recognizing that the prosecution had exercised all of its peremptory challenges to excuse women, the court found that Beauvais had established a prima facie case of discrimination and, proceeding to step two of <u>Batson</u>, required the

prosecution to provide gender-neutral reasons for its challenges. In response, the

prosecutor offered several reasons for each peremptory challenge:

> **Juror [S.B.]**, looked disinterested[3] during the questioning. She offered no — she never raised her hand for any issue. Never nodded when another juror spoke and oftentimes was looking away from me during my questioning looking at her watch. She appeared to me to be young and had no kids.

> **Juror [L.G.]**, during the period when we were waiting for the remainder of the jurors to come back[,] she was in the back of the courtroom and she was coughing heavily. I don't know if she was sick. She never indicated on the record that she was sick. But that was the impression I got.

> Her husband is in the legal field. She has two daughters. One of which she said was stalked. I think it is inappropriate to have someone whose family member so closely alleged to have been a victim of the same crime that we're charging here.

> **Juror [K.G.]**, is in college. . . . Has no kids. Appeared to be young. And it sounds as though she had a relationship with a large amount of law enforcement officers from the community from which she came to Denver.

> **Juror [A.B.]**, is also in college. Appeared to me to be young. Does not have any kids and did not expand on any of her comments when asked specifically about what we had spoken with [sic] prior to her getting on the panel. She seemed dead pan to me and gave no detailed explanations of why she was saying yes or no.

> **Juror [J.T.]**, also currently in college. . . . She also appeared young. Appeared disinterested. Did not volunteer any answers to my questions, although I tried to make eye contact with her to engage her in conversation. She never raised her hand or volunteered any information.

¶10 The trial court then gave Beauvais an opportunity to respond to the prosecution's

reasons. Beauvais argued that many of the prosecution's reasons were pretextual. As

---

3 We assume from the context of the transcript that the prosecution used the term "disinterested" to mean lacking attention or care for the proceedings, i.e., apathetic, rather than lacking a personal motive or stake in the proceedings, i.e., unbiased. See Disinterested, Webster's Third New International Dictionary (unabr. ed. 2002) (defining "disinterested" to include both of these meanings).

6

relevant here, Beauvais first asserted that four men on the jury did not have children, even though the prosecution partially based its challenges to three female potential jurors on this same trait. Second, as to the prosecution's reason that four female jurors appeared young or were attending college, Beauvais argued that three male jurors who were slated to serve on the jury also appeared young and "college age." Third, Beauvais stated that the prosecution "did not inquire as to [L.G.'s] health" and thus could not rely upon that reason for excusing her. Finally, Beauvais asserted that the prosecution's decision to waive its last peremptory challenge showed purposeful discrimination because exercising that challenge would have replaced a male juror with a female one. Beauvais did not comment on the demeanor of any of the jurors or in any way build a record as to juror demeanor.

¶11 The trial court asked if the prosecution wished to respond to Beauvais's arguments comparing certain male jurors to the dismissed female jurors. The prosecution noted that each of its peremptory challenges stemmed from the combination of several reasons, not just each reason individually: "When you look at each individual juror and the collection of reasons that each was stricken[,] that puts them in a different situation than any other particular juror on the panel." The trial court indicated that it would begin the orientation process for the jury and then take a recess to consider Beauvais's Batson challenge before making its step-three ruling. Beauvais did not address the combination-of-factors argument the prosecution advanced, nor did she take a final opportunity to make a record about the excused jurors' demeanor.

¶12 After the orientation and a recess, the trial court called the parties back into the courtroom and, outside the presence of the jury, issued its Batson ruling. "Ultimately," it

7

stated, "if either side were systematically or intentionally or purposefully attempting to discriminate against jurors because of race or religion or gender[,] that would be unacceptable in this courtroom and I would take that very seriously." Addressing the prosecution's peremptory challenges specifically, the trial court noted that it seemed that all of the potential jurors could be impartial and that the prosecution's reasons for exercising its challenges were "not strong." However, the court emphasized that the factors for exercising peremptory challenges are "subtle," making it difficult to rule on a Batson challenge and find purposeful discrimination. With these observations in mind, the trial court overruled Beauvais's Batson objection, stating that while it had "concerns given the nature and the outcome and the circumstances," Beauvais "h[ad] not established there was purposeful discrimination."

¶13    The jury ultimately found Beauvais guilty of one count of felony stalking under section 18-3-602(1)(c), C.R.S. (2016), and not guilty of the other charges. Beauvais appealed, arguing that the trial court had erred in overruling her Batson objections.

¶14    The majority of a division of the court of appeals concluded that the record was insufficient to facilitate review and thus remanded the case to the trial court to make additional findings under step three of Batson. People v. Beauvais, 2014 COA 143, ¶¶ 3–9, __ P.3d __. Specifically, the majority stated that it could not determine whether it was clear error for the trial court to rely on the female potential jurors' age, college attendance, or apparent sickness because, while these characteristics were "objectively verifiable and could potentially form the basis of a legitimate peremptory challenge," the trial court had "made no findings regarding the potential jurors' ages or health, and there is nothing in the

8

record to show whether the trial court believed that the prosecutor sought to excuse any of them because they were college students." Id. at ¶ 19. Therefore, the court of appeals directed the trial court on remand to make specific credibility findings about these three justifications. Id. at ¶ 20.

¶15 The majority also concluded that the prosecution's other gender-neutral reasons were incredible and raised an inference of purposeful discrimination. Id. at ¶¶ 11–20. In doing so, the majority explained that under Snyder v. Louisiana, 552 U.S. 472 (2008), it could not "presume the trial court found [the prosecution's demeanor-based reasons] to be credible" — and therefore could not credit them on appeal — because the trial court had not made express credibility findings for each of those reasons. Id. at ¶ 18 (citing Snyder, 552 U.S. at 485). Additionally, the majority stated that "[s]ome of the reasons the prosecutor offered for excusing female potential jurors . . . applied equally to many male potential jurors in the venire," which suggested that the prosecutor's reasons were pretextual. Id. at ¶ 12 (discussing male jurors who had prior experiences with stalking, who were childless, or who had friends in law enforcement).

¶16 In sum, the majority held that: (1) remand was necessary for the trial court to explicitly find whether the gender-neutral reasons of youth, college attendance, and apparent sickness were credible; (2) it could not infer that the trial court found the demeanor-based reasons credible given the lack of specific findings; and (3) the non-demeanor-based reasons that applied equally to male jurors were incredible and raised an inference of purposeful discrimination.

¶17 The dissent disputed the majority's conclusions regarding the necessity of remand and the inference of purposeful discrimination. Id. at ¶ 26 (Bernard, J., concurring in part, specially concurring in part, and dissenting in part). In the dissent's view, the majority failed to accord the trial court proper deference when the majority first rejected many of the prosecution's reasons for excusing the female potential jurors and then concluded the record was insufficient for lack of express credibility findings. Id. at ¶¶ 26, 34–35. The dissent acknowledged that the trial court could have made more specific findings to explain why it had found the prosecutor's gender-neutral explanations credible. Id. at ¶ 40. However, the dissent reasoned that the trial court's step-three analysis was sufficient because its "unambiguous finding means only one thing . . . in the context of this case: The trial court implicitly chose to believe the prosecutor, which was a choice that was 'peculiarly within [its] province.'" Id. at ¶¶ 40–44 (alteration in original) (quoting Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion)). For the dissent, it was "obvious that the trial court took this issue seriously," id. at ¶ 37, and that the trial court drew upon its personal observations of the process in making "the call that it thought was right," id. at ¶ 48. The dissent concluded that the majority, and other appellate courts, "should not second-guess that call because we have not seen what the trial court saw, or heard what the trial court heard." Id. at ¶¶ 46–48.

¶18 We granted certiorari and now reverse the court of appeals.

## II. Law

¶19 We begin our analysis by outlining Batson's three-step analysis for determining whether a party's use of peremptory challenges was motivated by purposeful

10

discrimination.  We then discuss a trial court's role in ruling on a <u>Batson</u> objection and the deference that a reviewing court owes to that ruling.  Next, we address this trial court's failure to make express credibility findings as to the prosecution's non-demeanor-based reasons, the same failure as to the prosecution's demeanor-based reasons, and the adequacy of the court of appeals' comparative juror analysis.  Ultimately, we conclude that the trial court here did not err in overruling Beauvais's <u>Batson</u> objection and that remand is therefore unnecessary.

### A.  The Three-Step <u>Batson</u> Framework

¶20    The Equal Protection Clause of the Fourteenth Amendment "forbids striking even a single prospective juror for a discriminatory purpose."  <u>Foster v. Chatman</u>, 136 S. Ct. 1737, 1747 (2016) (quoting <u>Snyder</u>, 552 U.S. at 478).  Accordingly, <u>Batson</u> and its progeny forbid parties in civil and criminal cases from exercising peremptory challenges to excuse potential jurors on the basis of race or gender.  <u>Batson</u>, 476 U.S. at 89 (race); <u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127, 129 (1994) (gender).

¶21    In <u>Batson</u>, the U.S. Supreme Court laid out a three-step analysis for trial courts to use in determining whether the striking party excused a potential juror on a discriminatory basis.  <u>Foster</u>, 136 S. Ct. at 1747.  First, the objecting party must make a prima facie showing that the striking party exercised a peremptory challenge on the basis of race or gender.  <u>Id.</u> Second, if the objecting party makes out a prima facie case, then the striking party must offer a non-discriminatory reason for striking each potential juror in question.  <u>Id.</u>  Finally, "in light of the parties' submissions, the trial court must determine whether the [objecting party] has shown purposeful discrimination" by a preponderance of the evidence.  <u>Id.</u>

11

(quoting Snyder, 552 U.S. at 476–77); accord Madison v. Comm'r, Ala. Dep't of Corr., 761 F.3d 1240, 1250 (11th Cir. 2014), cert. denied sub nom Madison v. Thomas, 135 S. Ct. 1562 (2015) (specifying the preponderance of the evidence standard) (citing Johnson v. California, 545 U.S. 162, 170 (2005)). The trial court's finding at step three as to whether the objecting party has shown purposeful discrimination is a "determination[] of credibility and demeanor" that lies "peculiarly within a trial judge's province." Snyder, 552 U.S. at 477 (quoting Hernandez, 500 U.S. at 365). Only the third step of the analysis is at issue here.

## B. Standard of Review

¶22 "[A] trial court's step-three determination as to the existence of [purposeful] discrimination is an issue of fact to which an appellate court should defer . . . ." People v. Rodriguez, 2015 CO 55, ¶ 13, 351 P.3d 423, 429. We set aside a trial court's factual findings only when they are so clearly erroneous as to find no support in the record. Downey v. People, 25 P.3d 1200, 1206 (Colo. 2001). A clear error review of a Batson ruling must examine all circumstances bearing upon whether intentional discrimination motivated the challenges. Foster, 136 S. Ct. at 1748. Given this deferential standard, reversal is only proper under "exceptional circumstances." Snyder, 552 U.S. at 477 (quoting Hernandez, 500 U.S. at 366).

## C. Step Three of Batson

¶23 The trial court's task at step three of a Batson analysis is to determine whether the objecting party proved that the striking party exercised peremptory challenges with a discriminatory animus. Rodriguez, ¶ 12, 351 P.3d at 429. One important tool that courts

12

use to make this determination is an assessment of the striking party's credibility and the plausibility of its non-discriminatory explanations. Id. This credibility evaluation is challenging because the exercise of peremptory challenges is often a matter of instinct, and even articulating the reason for a challenge can be difficult. Miller-El v. Dretke, 545 U.S. 231, 252 (2005); see also J.E.B., 511 U.S. at 148 (O'Connor, J., concurring) ("Indeed, often a reason for [striking a juror] cannot be stated, for a trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses . . . ."). Thus, a trial court must consider "all of the circumstances that bear upon the issue of" purposeful discrimination. Snyder, 552 U.S. at 478; accord People v. Cerrone, 854 P.2d 178, 191 (Colo. 1993). These circumstances include, among others, the striking party's demeanor, the plausibility of the explanations, and "whether the proffered rationale has some basis in accepted trial strategy." Miller-El v. Cockrell, 537 U.S. 322, 339 (2003). Indeed, "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." Snyder, 552 U.S. at 477 (alterations in original) (quoting Hernandez, 500 U.S. at 365).

¶24 "Though the trial court must evaluate all relevant facts, 'the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [objecting party].'" People v. Wilson, 2015 CO 54M, ¶ 14, 351 P.3d 1126, 1132 (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam)). Hence, a trial court should sustain a Batson objection only if the objecting party proves by a preponderance of the evidence that the striking party's non-discriminatory reasons are sufficiently incredible that the "'discriminatory hypothesis' better fits the evidence." Id.; accord Elem, 514 U.S. at 768

13

("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.").

¶25 As we explained above, this determination "lies peculiarly within a trial judge's province." Cockrell, 537 U.S. at 339 (quoting Hernandez, 500 U.S. at 365); accord Wilson, ¶¶ 13–14, 351 P.3d at 1131–32. The trial court is in the best position to evaluate the striking party's demeanor and the credibility of its justifications because the "trial judge is the judicial officer who watches and listens as voir dire unfolds, and who can discern the presence or absence of discriminatory intent." Wilson, ¶ 23, 351 P.3d at 1134 (quoting Valdez, 966 P.2d at 599 (Kourlis, J., dissenting)); accord Rodriguez, ¶ 18, 351 P.3d at 430–31. The trial judge is also in the best position to evaluate a potential juror's demeanor—and that of the striking party—when parties predicate peremptory strikes on the potential juror's demeanor. See Snyder, 552 U.S. at 479. It is for these reasons that appellate courts afford trial courts great deference and will only reverse under "exceptional circumstances." Id. at 477 (quoting Hernandez, 500 U.S. at 366).

### III. Analysis and Application

¶26 The People contend that the court of appeals erred in three ways: (1) by remanding for specific credibility findings on some of the prosecution's non-demeanor-based reasons for its peremptory challenges, (2) by refusing to credit the prosecution's demeanor-based reasons because the trial court did not expressly find them credible, and (3) by conducting a flawed comparative juror analysis. We address each of these contentions in turn.

14

## A. Express Credibility Findings on Non-Demeanor-Based Reasons

¶27 The People assert that the court of appeals erred when it remanded the case and ordered the trial court to make express credibility findings as to the prosecution's claim that it excused several female potential jurors in part because they were young, childless, in college, or apparently sick. The People assert that express credibility findings as to each of the striking party's non-demeanor reasons are not necessary to satisfy step three of Batson. Rather, according to the People, a trial court's ultimate decision to overrule a Batson objection can, under certain circumstances, be taken as an implicit crediting of the prosecution's reasons and thus survive clear error review. We agree.

¶28 In framing this issue, we emphasize that the purpose of the Batson analysis is to determine whether the party making the Batson objection has proven by a preponderance of the evidence that the striking party excused jurors with discriminatory intent. Assessing the striking party's credibility is an important component of that determination, but it is not the ultimate inquiry. Rather, the trial court's obligation at step three is to determine whether the objecting party met its burden of proof under Batson, and it is this determination that we review for clear error.

¶29 While express credibility findings significantly aid effective appellate review, the U.S. Supreme Court does not require them for a trial court's step-three determination. See, e.g., Thaler v. Haynes, 559 U.S. 43, 48 (2010) (per curiam) (reversing the Fifth Circuit Court of Appeals' broad characterization of Snyder as creating an express credibility finding requirement); Cockrell, 537 U.S. at 347 ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it."). Though the

15

Cockrell and Snyder Courts ultimately held that the respective trial courts had clearly erred, they did so on narrow, fact-specific grounds. Cockrell, 537 U.S. at 347 (holding that it was clear error to fail to consider or discuss grounds asserted in the objection); Snyder, 552 U.S. at 479–85 (holding that there was clear error where the record plainly refuted one basis for the challenge and the other basis was not subject to an express credibility finding and not credible on review).

¶30    Lower courts have followed suit and declined to require express credibility findings. A majority of the federal courts of appeals have affirmed Batson rulings on appeal where the trial courts failed to make express credibility findings.[4] Our court of appeals has also repeatedly held that step-three rulings based on implicit credibility determinations can survive clear error review.[5]

---

[4] See United States v. Thompson, 735 F.3d 291, 301 (5th Cir. 2013); United States v. Moore, 651 F.3d 30, 41–42 (D.C. Cir. 2011), aff'd in part on other grounds sub nom. Smith v. United States, 133 S. Ct. 714 (2013); Smulls v. Roper, 535 F.3d 853, 860–61 (8th Cir. 2008) (en banc); Messiah v. Duncan, 435 F.3d 186, 198 (2d Cir. 2006); Hightower v. Terry, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006); United States v. Castorena-Jaime, 285 F.3d 916, 929 (10th Cir. 2002); Evans v. Smith, 220 F.3d 306, 314 (4th Cir. 2000); United States v. Perez, 35 F.3d 632, 636 (1st Cir. 1994). But see United States v. McAllister, 693 F.3d 572, 581 (6th Cir. 2012); Riley v. Taylor, 277 F.3d 261, 286–87 (3d Cir. 2001) (en banc).

   The Seventh and Ninth Circuits arguably harbor internal splits on this issue. Compare Murray v. Schriro, 745 F.3d 984, 1007 (9th Cir. 2014), and United States v. Corley, 519 F.3d 716, 723 (7th Cir. 2008), with Green v. LaMarque, 532 F.3d 1028, 1031 (9th Cir. 2008), and United States v. Rutledge, 648 F.3d 555, 558–61 (7th Cir. 2011). But see Morgan v. City of Chicago, 822 F.3d 317, 330 (7th Cir. 2016) (explaining that the different results in Corley and Rutledge stemmed from the fact that their analyses were "tailored to the record before [the court]").

[5] See People v. DeGreat, 2015 COA 101, ¶¶ 36–37, __ P.3d __, cert. granted on other grounds, No. 15SC754 (Colo. Aug. 1, 2016); People v. Phillips, 2012 COA 176, ¶ 168, 315 P.3d 136, 171; People v. O'Shaughnessy, 275 P.3d 687, 691, 695 (Colo. App. 2010), aff'd. on other grounds sub nom. O'Shaughnessy v. People, 2012 CO 9, ¶ 1, 269 P.3d 1233, 1234; People v. Robinson, 187 P.3d 1166, 1174 (Colo. App. 2008).

16

¶31 The reasoning underlying these cases is largely driven by the highly deferential standard of review that appellate courts apply in evaluating step-three determinations. The Court has long recognized that trial courts are uniquely positioned to judge the credibility and demeanor of both the challenged jurors and the challenging attorneys when making a Batson ruling. Snyder, 552 U.S. at 477 (quoting Hernandez, 500 U.S. at 365). As with any other finding of fact, a highly deferential standard of review precludes an appellate court from substituting its reading of a cold record for the trial court's in-the-moment and better-informed determination. Cf., e.g., Gebhardt v. Gebhardt, 595 P.2d 1048, 1050 ("It is axiomatic that an appellate court cannot substitute itself as a finder of fact . . . .").

¶32 In Batson step-three rulings, the determination that trial courts must make is whether the objecting party proved by a preponderance of the evidence that discriminatory animus drove the striking party's use of peremptory challenges. Whether the challenging party has met its burden of proof is a finding of fact that must find support in the record to survive clear error review. Thus, while a trial court must consider all of the evidence bearing upon the plausibility of a non-discriminatory reason and the possibility of discriminatory animus, see Snyder, 552 U.S. at 478, it need not make express findings about that evidence and how it contributes to the court's ultimate ruling, see Wilson, ¶ 23, 351 P.3d at 1134 ("Having observed the prosecutor's demeanor firsthand, the trial court concluded that she stated 'an appropriate basis' for excusing [the potential juror]. The court thus implicitly found that the prosecutor was credible and that her race-neutral explanation for excusing [the potential juror] was sincere." (Emphasis added.)). Declining

17

to credit any Batson ruling unsupported by express credibility findings would ignore the central inquiry under a clear error review: whether that ruling is without support in the record. Consequently, we hold that an appellate court conducting a clear error review should defer to a trial court's ultimate Batson ruling so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion as to whether the objecting party proved purposeful discrimination by a preponderance of the evidence.

¶33 Applying these principles, we conclude that the trial court's step-three analysis here was adequate because the court properly conducted a Batson analysis and issued a Batson ruling that could be reviewed on the record.[6] Except for L.G.'s illness, the prosecution's non-demeanor-based reasons—that the potential jurors appeared young, were in college, or had no children—find support in the voir dire record independently from the prosecution's invocation of these reasons.[7] Notably, the trial court never found that the

---

[6] Though our holding today demonstrates that they are not strictly necessary, we strongly urge trial courts to make explicit factual findings as to the credibility of the striking party's non-discriminatory reasons to aid appellate review. Cf., e.g., Castorena-Jaime, 285 F.3d at 929 ("Although we affirm the district court's ruling, we encourage district courts to make explicit factual findings on the record when ruling on Batson challenges."); DeGreat, ¶ 37 ("Such findings improve the appellate record and permit more meaningful review."); O'Shaughnessy, 275 P.3d at 695. Express findings that the striking party's non-discriminatory reasons are (or are not) credible eliminate the need and temptation for appellate courts to embark on their own doomed efforts to make credibility determinations from a cold record. See Perez, 35 F.3d at 636.

[7] The trial court asked an initial battery of questions to elicit background information from each juror before allowing the parties to conduct voir dire. The court's questions asked jurors to provide their name; education; current occupation; marital status; place of birth; whether they had children; any connections with law enforcement; and whether they had previously served on a jury, and if so, for what sort of case. Beauvais also conceded that the challenged female potential jurors appeared to be young.

18

non-demeanor reasons were pretextual or that the prosecutor's demeanor was less than credible. It did state that the prosecution's reasons were "not strong" and that it was concerned about the "nature and the outcome of the circumstances," but it expressly noted that the burden of proof was on Beauvais and that she had failed to meet it.

¶34 The attention that the trial court paid to conducting a proper analysis before ultimately overruling Beauvais's Batson objection indicates that it considered all of the relevant circumstances and concluded that Beauvais did not establish that the prosecution's proffer of these gender-neutral reasons was purposefully discriminatory. Thus, the trial court's failure to specifically discuss the credibility of each of the prosecution's gender-neutral reasons individually does not render its ruling clearly erroneous or require remand for further findings.

¶35 Having determined that the trial court's failure to make express findings as to the prosecution's gender-neutral reasons of age, lack of children, college attendance, and apparent sickness does not render its ultimate step-three finding clearly erroneous, we now address the same question with regard to demeanor-based reasons.

## B. Express Credibility Findings on Demeanor-Based Reasons

¶36 The People argue that the court of appeals erred in holding that, under Snyder, an appellate court cannot credit a demeanor-based reason where the trial court did not expressly find the reason to be credible. They assert that an appellate court can presume that the trial court credited the prosecutor's demeanor-based reasons where the defendant did not dispute those reasons. We do not adopt the People's reasoning, but we agree that the court of appeals erred in its application of Snyder because the trial court's obligation at

19

step three is the same regardless of whether the striking party offers non-demeanor or demeanor-based reasons. We therefore hold that a trial court's failure to make specific credibility findings about demeanor-based reasons does not—on its own—prevent a reviewing court from concluding that the trial court credited those reasons.

¶37 Consistent with our holding that a step-three ruling can survive clear error review without express credibility findings, we conclude that the trial court's proper application of the Batson analysis yielded a step-three ruling, supported by the record, that the defendant had not met her burden in proving that purposeful discrimination had motivated the prosecutor's peremptory strikes here. We begin our analysis with an examination of Snyder.

¶38 In Snyder, the defense raised Batson objections to the prosecution's peremptory challenges of two black potential jurors. Snyder, 552 U.S. at 477. The prosecution gave two race-neutral reasons for striking one of the potential jurors: (1) that he "looked very nervous," and (2) that he was a student teacher with teaching obligations that might incentivize him to vote for a lesser verdict in order to avoid a lengthy penalty phase. Id. at 478. The trial court ruled in step three of its Batson analysis that it was "going [to] allow the [peremptory] challenge" without identifying whether it credited either or both of the prosecution's step-two reasons. Id. at 479.

¶39 The U.S. Supreme Court ultimately held that the trial court had committed clear error in its step-three ruling. Id. at 484–86. The Court expressed concern that the challenge and ruling as to the demeanor-based reason occurred the day after the juror exhibited the alleged demeanor, and that the trial court never expressly found this demeanor-based

20

reason to be credible. Id. at 479. The Court also concluded that the non-demeanor reason was pretextual because the record plainly refuted it. Id. at 480–83, 485. This posture presented the Court with the "exceptional circumstances" that merit reversal even under a deferential clear error review. See id. at 474, 477. The tenuous credibility of the step-three ruling as to the demeanor-based reason, coupled with the possibility that the trial court might have based its ruling entirely on the pretextual non-demeanor-based reason, meant that the Court could not simply "presume that the trial judge credited the prosecutor's assertion that [the juror] was nervous." Id. at 485. With no other basis in the record to which the Court could defer, it reversed the trial court. Id. at 485–86.

¶40    The Court has since clarified that Snyder did not announce a broad rule requiring express credibility findings but was instead the result of "the particular circumstances of [that] case." Haynes, 559 U.S. at 48–49. The Haynes Court emphasized that the prosecution's step-two reasons in Snyder were either pretextual or incredible for reasons unique to those facts. Id. Some courts have ignored this admonition and inferred a more sweeping rule that would preclude appellate courts from crediting any Batson ruling predicated on demeanor-based reasons that were not also the subject of express credibility findings. See, e.g., United States v. McMath, 559 F.3d 657, 665–67 (7th Cir. 2009). But a majority of courts applying Snyder have adopted a more narrow reading of the case in line with the Haynes Court's clarification. See e.g., United States v. Thompson, 735 F.3d 291, 300–01 (5th Cir. 2013); United States v. Moore, 651 F.3d 30, 42 (D.C. Cir. 2011), aff'd in part on other grounds sub nom. Smith v. United States, 133 S. Ct. 714 (2013); Smulls v. Roper, 535 F.3d 853, 860–61 (8th Cir. 2008) (en banc); see also People v. DeGreat, 2015 COA 101,

¶¶ 35–37, __ P.3d __, <u>cert. granted on other grounds</u>, No. 15SC754 (Colo. Aug. 1, 2016); <u>People v. O'Shaughnessy</u>, 275 P.3d 687, 691 (Colo. App. 2010).

¶41     We agree with the courts that confine <u>Snyder</u> to its facts. <u>Snyder</u> exemplifies a record on which the trial court's <u>Batson</u> ruling was not plausible and constituted clear error. <u>Cf. Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573–74 (1985) (discussing clear error). This narrow reading of <u>Snyder</u> reconciles its analysis and holding with the highly deferential clear error standard of review and avoids inconsistency between how our lower courts treat demeanor-based and non-demeanor-based reasons. It also recognizes the practical consideration that the trial court may not—and need not—have observed the complained-of demeanor. <u>Haynes</u>, 559 U.S. at 48. We therefore hold that a trial court's failure to make specific credibility findings about demeanor-based reasons does not—on its own—prevent a reviewing court from concluding that the trial court credited those reasons.

¶42     In so holding, we reject the People's argument that <u>Snyder</u> requires trial courts to make express credibility findings as to demeanor-based challenges only where the objecting party specifically disputes the demeanor-based reason. As discussed above, the <u>Snyder</u> Court's conclusion that it could not presume that the trial court credited the demeanor-based reason was based on several factors unrelated to whether the objecting party disputed that reason. We see no basis, in <u>Snyder</u> or otherwise, to adopt the People's rule. The central inquiry in reviewing a <u>Batson</u> ruling remains whether that ruling is supported in the record. <u>See, e.g., Snyder</u>, 552 U.S. at 477; <u>Rodriguez</u>, ¶ 13, 351 P.3d at 429.

22

Thus, while an objecting party's decision to dispute (or not dispute) a demeanor-based reason may factor into the clear error analysis, it is not, by itself, dispositive.

¶43    Here, the court of appeals majority analogized the proceedings below to those in Snyder, explaining that several of the prosecutor's non-demeanor-based reasons were refuted by the record and had not been subject to credibility findings. Beauvais, ¶ 18. The majority concluded that it could not presume that the trial court credited either the demeanor-based reasons or the otherwise credible non-demeanor-based reasons given the lack of credibility findings. Id. Because the trial court was not required to make express credibility findings as to the demeanor-based reasons, we conclude that the trial court did not clearly err regardless of whether it credited the prosecution's demeanor-based reasons.

¶44    As we explained above, the trial court's careful Batson analysis indicates that it accounted for all of the prosecution's step-two reasons in concluding that Beauvais had failed to prove by a preponderance of the evidence that these reasons were pretextual. It is true that the trial court did not expressly find the demeanor-based reasons to be credible. But neither did Beauvais rebut these reasons or otherwise build a record on juror demeanor.[8] Significantly, the trial court did not indicate that it thought the prosecution was being disingenuous in offering these reasons, and there is nothing in the record to otherwise refute the prosecution's assessment of the challenged jurors' demeanor. Therefore, we conclude in this case that the trial court did not clearly err in rendering its

---

[8] To the limited extent that the complained-of demeanor—lack of engagement during voir dire—appears in the record, the evidence supports the prosecution's assertions that these potential jurors responded concisely to its questions and did not otherwise volunteer information.

<u>Batson</u> ruling without also making express credibility findings as to the demeanor-based reasons.

## C. Comparative Juror Analysis

¶45    Finally, we examine whether the court of appeals erred in its comparative juror analysis by: (1) comparing potential jurors on a trait—unwillingness to participate or volunteer answers—that Beauvais did not argue to the trial court, and (2) comparing specific traits rather than considering all proffered reasons for striking each juror.[9] We conclude that the court of appeals erred.

¶46    Ultimately, the purpose of the <u>Batson</u> analysis is to detect whether a party has violated the Fourteenth Amendment's guarantee of equal protection by excusing a juror on the basis of race or gender. To accomplish this task, a trial court must determine at step three whether the objecting party has established by a preponderance of the evidence that the striking party engaged in purposeful discrimination in exercising its peremptory challenges. A proper comparison of two jurors is one tool that can aid in that determination: If a striking party's stated reasons for striking a female potential juror apply equally to an otherwise-similar male potential juror who ultimately serves on the jury, then "that is evidence tending to prove purposeful discrimination." <u>See</u> <u>Dretke</u>, 545 U.S. at 241.

---

[9] The People also petitioned this court to review the court of appeals' decision to use in its comparative juror analysis certain male potential jurors whom the defense excused before the prosecutor accepted the panel. <u>See</u> <u>Beauvais</u>, ¶¶ 12, 14, 18 (discussing L.G. and two excused male potential jurors, all of whom had experiences with stalking in the past). Beauvais concedes that the court of appeals erred when it included the excused male potential jurors in its comparative juror analysis. Hence, in the absence of any controversy, we do not address this issue.

¶47 Comparing jurors, however, must be done carefully. A retrospective comparison of jurors based on a cold appellate record is inherently limited and prone to error. See, e.g., Snyder, 552 U.S. at 483; Davis v. Ayala, 135 S. Ct. 2187, 2201 (2015).

¶48 We examine the court of appeals' comparative juror analysis in this case to decide first whether a comparison not argued to the trial court may properly be the subject of a comparative juror analysis on review, and second, whether single-trait comparisons are adequate. We hold that appellate courts may conduct comparative juror analyses despite an objecting party's failure to argue a comparison to the trial court, but only where the record facilitates a comparison of whether the jurors are similarly situated. An empaneled juror is similarly situated to a dismissed potential juror for the purposes of an appellate court's comparative juror analysis if the empaneled juror shares the same characteristics for which the striking party dismissed the potential juror.

### 1. Unargued Juror Comparisons

¶49 At trial, the prosecution's step-two reasons for striking several potential jurors (S.B., K.G., and J.T.) included the assertion that these specific jurors were not sufficiently engaged during voir dire. The defense did not challenge these grounds or conduct a comparative juror analysis. As a result, there is nothing in the record regarding those potential jurors' level of engagement beyond the prosecution's assertions. The court of appeals nevertheless conducted a comparative juror analysis on juror engagement, concluding that "several males on the panel" also did not show a willingness to participate in jury selection or volunteer answers and that this raised an inference of purposeful discrimination. See

Beauvais, ¶¶ 12, 18.  The People assert that it is per se erroneous to conduct a comparative juror analysis with regard to traits compared for the first time on appeal.

¶50    We initially note that this question is not one of issue preservation; both the voir dire record and the <u>Batson</u> objection were properly before the courts below.  See <u>Dretke</u>, 545 U.S. at 241 n.2.  But while Beauvais preserved her <u>Batson</u> objection, she failed to argue or make a record on juror engagement.  Such a failure results in a record that is unlikely to support that argument on review.  Consequently, an appellate court's review of a cold record can be especially "misleading when alleged similarities were not raised at trial." <u>Snyder</u>, 552 U.S. at 483.  Because appellate courts can only access information that the parties develop for the record, a comparison unargued is also one that goes untested and unsupported.  <u>See</u> <u>id.</u>  At the very least, an objecting party's failure to raise an alleged similarity to the trial court suggests that it is not a useful comparison.

¶51    For these reasons, this court has previously declined to conduct a comparative juror analysis when the objecting party failed to argue the comparison to the trial court.  <u>Valdez</u>, 966 P.2d at 594 ("It was incumbent on the defense counsel to raise this argument to the trial court.  If it was not apparent to the defense counsel that Mr. D was similarly situated to Mr. P, it is unreasonable to expect that the trial court should have noted the comparison on its own.").  Today we clarify <u>Valdez</u> and address when juror comparisons can appropriately be considered for the first time on appeal.

¶52    Unargued juror comparisons can be appropriate tools for discovering discriminatory animus, but their use should be limited to instances in which the reviewing court can make an informed comparison.  Appellate courts can only make an informed comparison—i.e.,

accurately and reliably compare jurors on unargued traits—where the record is otherwise developed as to the material circumstances bearing on whether they are similarly situated. Ensuring that a reviewable record exists will often require an objecting party's deliberate effort, especially where the compared trait is subjective or demeanor based (rudeness, apathy, inattentiveness) rather than objectively verifiable (age, employment, marital status). We do not intend to overburden trial courts with a duty to build an exhaustive record during voir dire. But without a record that facilitates a complete and meaningful comparison, appellate courts have no basis to review and reverse Batson rulings based on unargued comparisons. Consequently, we hold that appellate courts may conduct comparative juror analyses despite an objecting party's failure to argue a comparison to the trial court, but only where the record facilitates a comparison of whether the jurors are similarly situated.

¶53 Applying this rule here, we conclude that the court of appeals' comparative juror analysis as to juror engagement during voir dire is improper on this underdeveloped record. As we concluded above, the trial court's decision to overrule Beauvais's Batson objections as to S.B., K.G., and J.T. implicitly credited the prosecution's assertion that these jurors "looked disinterested," "seemed deadpan," or did not adequately answer questions or volunteer information during voir dire. To the extent that these venire members spoke, the voir dire transcript demonstrates that S.B., K.G., and J.T. spoke infrequently and concisely. Nothing in the record, however, describes the same jurors' facial expressions, gestures, or body language. As a result, the record does not rebut the prosecution's assertions that it dismissed these venire members in part for lack of engagement.

Additionally, and in large part because Beauvais failed to raise these demeanor-based comparisons to the trial court, the record is silent as to any male juror who was similarly situated to S.B., K.G., or J.T. in lack of engagement and who, despite being indifferent to the proceedings, was nevertheless empaneled. Absent a developed record, we cannot compare the challenged jurors to empaneled jurors in this material respect and cannot therefore conclude that the trial court clearly erred.

## 2. Single-Trait Comparisons

¶54 The People also contend that the court of appeals erred in comparing jurors with regard to individual traits rather than comparing them in all material circumstances that bear on whether two jurors are similarly situated. We agree.

¶55 Beauvais argued at trial that seven unexcused male jurors were similarly situated to several female potential jurors—S.B., K.G., A.B., and J.T.—whom the prosecution did excuse because they were young, had no children, or both. The trial court made no express credibility findings in this regard, but its ultimate ruling against Beauvais rejected this argument. The court of appeals reversed, concluding that because the record reflected that each of the excused female potential jurors shared at least one of these characteristics with an unchallenged male potential juror, their dismissal could be the result of gender discrimination. Beauvais, ¶¶ 18–20.

¶56 This sort of comparison minimizes the deference due under a clear error review. Two potential jurors need not be identical in every respect for them to be similarly situated and for the comparison to give rise to an inference of pretext. See Dretke, 545 U.S. at 247 n.6 ("A per se rule that a defendant cannot win a Batson claim unless there is an exactly

identical white juror would leave <u>Batson</u> inoperable; potential jurors are not products of a set of cookie cutters."). But the inverse is also true: Isolated similarities do not automatically render two jurors "similarly situated" for purposes of deciding a <u>Batson</u> challenge. Trial courts, unrestrained by a deferential standard of review and informed by their first-hand observations of the venire and the parties, are positioned to credit or ignore individual reasons in conducting comparisons; appellate courts are not.

¶57 We therefore hold that an empaneled juror is similarly situated to a dismissed potential juror for the purposes of an appellate court's comparative juror analysis if the empaneled juror shares the same characteristics for which the striking party dismissed the potential juror. For example, if an attorney strikes a female potential juror because she is unemployed <u>and</u> lacks a college degree, a male potential juror who is <u>either</u> unemployed <u>or</u> lacks a college degree would not be similarly situated and not suitable for comparison. Conversely, a male potential juror who is both unemployed <u>and</u> lacks a college degree would be similarly situated to the excused female potential juror, and if the striking party did not strike him as well, this would be "evidence tending to prove purposeful discrimination." It is even more important to compare jurors with regard to all traits listed as reasons for striking the challenged juror where, as here, the striking party credits the combination of these traits as the reason for excusing that juror. A party exercising peremptory challenges is free to do so for any non-discriminatory reason or combination of non-discriminatory reasons that furthers its litigation strategy. <u>Elem</u>, 514 U.S. at 767–68; <u>Batson</u>, 476 U.S. at 89. A court cannot substitute its own litigation strategy for that of the striking party. To avoid doing so, courts should tailor comparative juror analyses to the

striking party's reasons for striking a challenged juror. Applying this standard to the present case reveals dispositive differences between the challenged female potential jurors and the male empaneled jurors.

¶58 First, in addition to being young and childless, female potential jurors K.G., A.B., and J.T. were all attending college at the time of voir dire. Current college attendance was another gender-neutral characteristic that the prosecution gave as a step-two reason for dismissing these potential jurors. None of the allegedly comparable male potential jurors was attending college at the time of voir dire.

¶59 Second, the prosecution excused female potential juror L.G. because she was "coughing heavily." The record does not reflect that any other potential juror exhibited similar symptoms. Additionally, the prosecution challenged L.G. because her spouse was in the legal field and one of her children had been a victim of stalking, a combination of characteristics unique in the jury pool.

¶60 Finally, the prosecution excused S.B., A.B., and J.T. not only because they were young or lacked children, but also because they were disengaged during voir dire.[10] As discussed above, Beauvais failed to argue or make a record on juror engagement at trial. Without a developed record, we cannot meaningfully compare S.B., A.B., and J.T. to the male jurors in this regard. Hence, we conclude that the court of appeals erred in doing so.

---

[10] The prosecution specifically alleged that: (1) S.B. "looked disinterested," "never nodded," and "oftentimes was looking away from me during my questioning [or] looking at her watch"; (2) A.B. "seemed deadpan"; and (3) J.T. "appeared disinterested" and did not volunteer information or answers despite the prosecution's effort to "make eye contact with her."

¶61     In sum, the record shows that the challenged female potential jurors exhibited unique combinations of traits that materially distinguished them from the empaneled male jurors. This supports the trial court's rejection of these juror comparisons, a finding to which we owe deference. Thus, we conclude that the trial court did not clearly err when it implicitly rejected Beauvais's comparisons in determining that Beauvais had not proved purposeful discrimination.

## IV. Conclusion

¶62     We take a final opportunity to reiterate that a trial court's obligation at step three of a <u>Batson</u> analysis is to make a determination as to whether the objecting party proved by a preponderance of the evidence that the striking party exercised a peremptory challenge on a discriminatory basis. It is this finding of fact that we are called to review here. The tools we discussed above—credibility determinations and comparative juror analyses—are simply that, tools. They are not the required end product of a step-three ruling, but rather two means to achieve that end. The trial court here made a difficult finding on a close record; had it found in Beauvais's favor, we no doubt would have affirmed that decision as well. It did not.

¶63     First, we hold that an appellate court conducting a clear error review should defer to a trial court's ultimate <u>Batson</u> ruling so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion as to whether the objecting party proved purposeful discrimination by a preponderance of the evidence. Second, we hold that a trial court's failure to make specific credibility findings about demeanor-based reasons does not—on its own—prevent a reviewing court from

31

determining that the trial court credited those reasons. Finally, we hold that appellate courts may conduct comparative juror analyses despite an objecting party's failure to argue a comparison to the trial court, but only where the record facilitates a comparison of whether the jurors are similarly situated. An empaneled juror is similarly situated to a dismissed potential juror for the purposes of an appellate court's comparative juror analysis if the empaneled juror shares the same characteristics for which the striking party dismissed the potential juror.

¶64 Accordingly, we reverse the judgment of the court of appeals.

**JUSTICE MÁRQUEZ** dissents.

JUSTICE MÁRQUEZ, dissenting.

¶65 I respectfully dissent. Without question, trial courts have "a pivotal role in evaluating Batson claims." Snyder v. Louisiana, 552 U.S. 472, 477 (2008). Because they work on the front lines of our legal system, trial judges "see and hear things that we on the appellate courts cannot see or hear," including facial expressions, tone of voice, body language, and other behavior relevant to making credibility determinations. People v. Beauvais, 2014 COA 143, ¶¶ 46–47, __ P.3d __ (Bernard, J., concurring in part, specially concurring in part, and dissenting in part). For this reason, deference to a trial court is "especially appropriate where a trial judge has made a finding that an attorney credibly relied on [a juror's] demeanor in exercising a [peremptory] strike." Snyder, 552 U.S. at 479.

¶66 But deference to a trial court's actual findings regarding a prosecutor's credibility or a potential juror's demeanor is very different from the deference the majority now gives a trial court's "ultimate Batson ruling." Maj. op. ¶ 2. The majority purports to give such deference only where "the record reflects that the trial court weighed all of the pertinent circumstances." Id. Yet it simultaneously absolves trial courts of any obligation to make findings or otherwise lay an adequate record for appellate review. See id. at ¶¶ 32, 42. This tension in the majority's approach renders appellate review a hollow exercise: How can a reviewing court meaningfully determine whether a trial court "weighed all of the pertinent circumstances" if the trial court need not make any findings at all? I fully respect the deference we must give to trial courts' assessments of credibility and demeanor, but where the trial court makes no findings regarding any of several proffered reasons for exercising a peremptory strike, there is nothing on the record to which a reviewing court can properly

1

defer. To reflexively uphold a trial court's <u>Batson</u> ruling under such circumstances is not the kind of justifiable deference owed to a trial court's assessment of credibility or demeanor—rather, it becomes an abdication of our responsibility as appellate courts. Today's ruling, I fear, will only further erode <u>Batson</u>'s protections. <u>See</u> Michael J. Raphael & Edward J. Ungvarsky, <u>Excuses, Excuses: Neutral Explanations under *Batson v. Kentucky*</u>, 27 U. Mich. J.L. Reform 229, 267 (1993) ("We believe that our empirical analysis shows that the courts now lean far too heavily towards accepting prosecutors' rationalizations for their peremptory challenges and demanding few limitations on prosecutors' discretion to use strikes, notwithstanding <u>Batson</u>'s inference of discrimination."); Jeffrey Bellin & Junichi P. Semitsu, <u>Widening *Batson*'s Net to Ensnare more than the Unapologetically Bigoted or Painfully Unimaginative Attorney</u>, 96 Cornell L. Rev. 1075, 1106 (2011) ("<u>Batson</u>, as currently applied, is unable to prevent the use of race in jury selection because its dictates are so easily avoided.").

¶67 The majority's approach also contravenes recent United States Supreme Court precedent. The trial court's role in step three of the <u>Batson</u> analysis is to weigh the arguments of counsel and determine whether the strike proponent's proffered explanation should be believed. A conclusory ruling with no findings does not satisfy this obligation. The Supreme Court plainly required more in <u>Snyder</u>, 552 U.S. at 485–86. It also required more in <u>Foster v. Chatman</u>, 136 S. Ct. 1737, 1743 (2016). And this court should require more here, because the existing record simply does not support the trial court's ruling.

¶68 Notably, the majority does not explain how this record establishes that the trial court in fact "weighed all of the pertinent circumstances." The prosecutor's consistent pattern of

2

strikes in this case is troubling, particularly given that several of the reasons given for removing female jurors also applied to male jurors who were allowed to remain on the panel. Although the trial court could have simply credited one or more of the prosecutor's explanations, it didn't actually do that. To the contrary, the court expressed nothing but skepticism of those explanations. Beyond that, the court's only comments focused on considerations that are irrelevant to a <u>Batson</u> analysis, namely, the likelihood of a mistrial if the court found a <u>Batson</u> violation (with accompanying speedy trial implications); the fact that the remaining jurors appeared to be impartial; and the fact that the prosecution fell short of removing <u>all</u> of the women on the panel. In short, nothing in the record before us reflects that the trial court actually weighed <u>any</u> of the pertinent circumstances. Accordingly, deference to the trial court's ultimate <u>Batson</u> ruling is not warranted here. Rather, because the proper remedy for an inadequate <u>Batson</u> analysis is to remand to the trial court with directions to "make the required factual findings," <u>People v. Rodriguez</u>, 2015 CO 55, ¶ 21, 351 P.3d 423, 431, I would remand this case for the trial court to do just that.

## I. The United States Supreme Court's <u>Batson</u> Jurisprudence

¶69     The Equal Protection Clause of the Fourteenth Amendment forbids an attorney from using a peremptory strike to remove a juror because of the juror's race. <u>Batson v. Kentucky</u>, 476 U.S. 79, 84 (1986). Equal protection also forbids striking a juror based on the juror's gender. <u>J.E.B. v. Alabama</u>, 511 U.S. 127, 129, 146 (1994). Purposeful discrimination in jury selection harms both litigants and the individual jurors who are wrongfully excluded, and diminishes the public's confidence in the fairness of judicial proceedings. <u>Id.</u>

at 140; Batson, 476 U.S. at 87. For these reasons, "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." Foster, 136 S. Ct. at 1747 (quoting Snyder, 552 U.S. at 478).

¶70 While the present case was pending before this court, the United States Supreme Court announced its decision in Foster v. Chatman, reversing the denial of a capital defendant's Batson challenge after the prosecution used peremptory strikes to remove all of the black potential jurors from the panel. 136 S. Ct. at 1743, 1755. Foster reaffirms the essential role of appellate courts in preventing purposeful discrimination in jury selection in a line of cases including Snyder, 552 U.S. at 478, Miller-El v. Dretke, 545 U.S. 231, 239 (2005), and Batson, 476 U.S. at 96, and confirms several of Batson's central precepts relevant to the resolution of this case.

¶71 First, Foster confirms that both trial and appellate courts must consider "all of the circumstances" that inform whether a Batson violation has occurred. This requires a "sensitive inquiry into such circumstantial evidence as may be available." Foster, 136 S. Ct. at 1748 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)).

¶72 In Foster, the Supreme Court had the benefit on habeas review of new information that the trial court did not have when it made its Batson ruling. After exhausting his direct appeal, Foster initiated state habeas corpus proceedings, during which he obtained the prosecution's file for his case. Id. at 1743–44. These documents included the jury venire list with the names of black prospective jurors highlighted in green and marked with the letter "B"; handwritten notes on black prospective jurors identifying them as "B#1," "B#2," and

4

"B#3"; and a list, titled "definite NO's [sic]," which included the names of all five qualified black prospective jurors. Id. at 1744.

¶73  Although this evidence was not before the trial court when it made its Batson ruling, the Court nevertheless reviewed these documents in considering the prosecution's explanations to the trial court for exercising its peremptory challenges. Id. at 1748, 1749–50, 1753. The Court's consideration of this new evidence confirms that reviewing courts must consider "all of the circumstantial evidence" when reviewing a Batson challenge. Id. at 1754.

¶74  Second, Foster reminds us that a reviewing court cannot credit an explanation for exercising a peremptory strike if that explanation is refuted by the record. For example, one prosecutor in Foster told the trial court that he struck a black juror because defense counsel did not question that juror about her opinions on the issues of insanity, alcohol, and the publicity surrounding the case — but trial transcripts showed that defense counsel asked the juror several questions about each of these topics. Id. at 1750. And although the prosecutor claimed that he struck another juror because defense counsel failed to ask him his thoughts about the age of the defendant, insanity, and pretrial publicity, the transcripts also refuted this assertion. Id. at 1754. Because the record directly contradicted these proffered explanations, the Supreme Court refused to credit them. Id. at 1750.

¶75  Third, Foster affirms that comparative juror analysis is a useful tool to uncover purposeful discrimination: "As we explained in Miller-El v. Dretke, '[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar

5

nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.'" Id. at 1754 (alterations in original) (quoting 545 U.S. at 241).

¶76 Notably, the majority holds today that a comparative juror analysis limits comparison to only the full combination of traits given as reasons for striking a juror. Maj. op. ¶ 57. In other words, the majority states, "if an attorney strikes a female potential juror because she is unemployed and lacks a college degree, a male potential juror who is either unemployed or lacks a college degree would not be similarly situated and not suitable for comparison." Id. But the Supreme Court's recent Batson analysis in Foster plainly rejects this approach. There, the Court compared the prosecutor's justifications for striking black potential jurors with characteristics of white jurors whom the State accepted and concluded that the State's proffered explanations were pretextual. Foster, 136 S. Ct. at 1750–52. Notably, in so doing, the Court compared jurors on the basis of single traits, even though the prosecution offered multiple reasons for striking particular jurors.

¶77 For example, the prosecution articulated a "laundry list" of eleven reasons for striking thirty-four-year-old black potential juror Marilyn Garrett, including because she was divorced and too young. Id. at 1748, 1750. In conducting its comparative juror analysis, the Court never suggested that to be similarly situated and suitable for comparison, a white juror must share the same combination of traits as the black juror who was removed. To the contrary, the court compared several white jurors who shared only a single trait with Garrett. For instance, the Court observed that the prosecution declined to strike three out of four prospective white jurors who, like Garrett, were divorced. Id. at 1750. It then separately observed that the prosecution declined to strike eight white

prospective jurors under the age of thirty-six—including a twenty-one-year-old who served on the jury. Id. at 1750–51.

¶78 The Court's comparative juror analysis for black potential juror Eddie Hood followed the same approach. The prosecution gave eight reasons for striking Hood, including because he had a son close in age to the defendant, and because his wife worked at a particular hospital that served people with mental illness. Id. at 1751, 1754. The Court did not suggest that to be comparable, a white juror must share all the traits the prosecution identified as reasons for striking Hood. To the contrary, it pointed out that the State accepted two white jurors who each had a son about the age of the defendant, including one who admitted in voir dire that Foster's youth probably would be a factor she would consider during sentencing. Id. at 1752. Separately, it noted that the prosecution expressed no concerns about a white juror who had worked at the same hospital as Hood's wife, and who ultimately served on the jury. Id. at 1754.

¶79 Reviewing this and other circumstantial evidence, the Court concluded that the prosecutors were motivated in substantial part by the race of the jurors when they struck Garrett and Hood from the panel, and therefore the prosecution's strikes ran afoul of Batson. Id. By now requiring a comparable juror to share all the traits of a juror who was removed by a peremptory strike, the majority's opinion will, as a practical matter, mean the end of meaningful comparative juror analysis. A party facing a Batson challenge need only be sure to recite two, or three (or eight, or eleven) reasons for striking a juror (like the prosecution in Foster did for jurors Hood and Garrett) to avoid comparisons that would expose those reasons as pretextual.

7

¶80    The majority's ruling today also misreads the Supreme Court's opinion in <u>Snyder</u>. In that case, the prosecutor offered two race-neutral reasons for striking black potential juror Jeffrey Brooks. <u>Snyder</u>, 552 U.S. at 478. First, Brooks "looked very nervous" during voir dire. <u>Id.</u> Second, he expressed concern that he would have to miss his student-teaching classes. <u>Id.</u> With respect to the demeanor-based explanation, the Court noted that "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." <u>Id.</u> at 479. Critically, however, the record in that case did not show that the trial judge "actually made a determination concerning Mr. Brooks' demeanor." <u>Id.</u> Instead, the court simply allowed the peremptory challenge "without explanation." <u>Id.</u> Given the absence of any explanation from the trial court for its <u>Batson</u> ruling, the Court concluded, "we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous." <u>Id.</u>

¶81    After refusing to credit the prosecutor's demeanor-based explanation, the Court relied in part on comparative juror analysis to conclude that the prosecutor's other proffered reason was pretextual. <u>Id.</u> at 483–85. Because the prosecutor's alternative explanation gave rise to an inference of discriminatory intent, and the record did not show that the prosecution would have challenged Brooks based on his nervousness alone, <u>id.</u> at 485, the Court reversed and remanded, concluding that the trial court clearly erred in its <u>Batson</u> ruling. <u>Id.</u> at 474, 485–86.

¶82    Importantly, the <u>Snyder</u> Court refused to credit the prosecutor's demeanor-based explanation for striking potential juror Brooks because of the "absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous." <u>Id.</u> at

8

479, 485. By contrast, the majority today holds that a trial court "need not make express findings" about the evidence bearing upon the plausibility of a proffered reason for striking a juror or "how [that evidence] contributes to the court's ultimate ruling." Maj. op. ¶ 32. I fail to understand how the majority's approach squares with Snyder, at least where the prosecution offers a demeanor-based justification for striking a potential juror.

¶83 The majority's reliance on Thaler v. Haynes, 559 U.S. 43 (2010), is misplaced. Maj. op. ¶ 29. In that case, two different judges presided during jury selection—one during voir dire, and another when peremptory challenges were exercised. Thaler, 559 U.S. at 44. The Supreme Court rejected a blanket rule that a reviewing court must find clear error where the record shows the trial court was not able to verify the aspect of the prospective juror's demeanor cited by the prosecution for its peremptory challenge. Id. at 46, 49. The Court reiterated that where an explanation is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations the judge was able to make of the juror during voir dire—but that a demeanor-based explanation need not be rejected just because the judge did not observe or cannot recall the juror's demeanor. Id. at 48. Rather, the judge can still accept the prosecutor's explanation based on the judge's assessment of the prosecutor's credibility and demeanor. Id. at 49. But nothing in Thaler absolves trial courts of the obligation to make findings or otherwise lay an adequate record for appellate review, as the majority holds today.[11]

---

[11] The majority's citation to People v. Wilson, 2015 CO 54M, 351 P.3d 1126, fares no better as support for today's holding. Maj. op. ¶ 32. In that case, the trial court did make

9

## II. Application

¶84     In the majority's view, the trial court's <u>Batson</u> ruling was adequate in this case because the court concluded that Beauvais had not met her burden of proof. Maj. op. ¶¶ 12, 34. Under this circular logic, a trial court's ruling rejecting a <u>Batson</u> claim is adequate because the trial court rejected the <u>Batson</u> claim. The majority's approach absolves the trial court of its critical obligation to articulate which of several proffered justifications are credible. Moreover, it essentially insulates the trial court's ruling from any meaningful appellate review.

¶85     Certainly if the prosecution offers only a single reason for striking a juror and the trial court concludes that the defendant has failed to meet his burden under the <u>Batson</u> framework, an appellate court may logically presume that the trial court implicitly credited the prosecution's single proffered justification. <u>E.g.</u>, <u>People v. O'Shaughnessy</u>, 275 P.3d 687, 692 (Colo. App. 2010) ("[T]he only reason the prosecutor gave for striking Prospective Juror T was based on her demeanor. Thus, there is no question that the trial court's acceptance of the prosecutor's explanation is entitled to deference on review."). That is not the case here, however, where the prosecution gave between three and five reasons for striking each of the female prospective jurors. On review, we cannot readily determine which, if any, of these justifications the trial court found credible.

---

observations about the juror who was removed, noting that the juror "waffled back and forth" and "hesitated for an extended period" in voir dire. <u>Wilson</u>, ¶ 19, 351 P.3d at 1133.

¶86　The record before us instead strongly suggests that the prosecution purposefully removed potential jurors from the venire because they were female.[12]　The prosecution used five of its six peremptory strikes to remove women.　It also chose to waive its final peremptory challenge; had the prosecution used its sixth strike, another female would have been empaneled on the jury.　A "pattern" of strikes against a class of jurors gives rise to an inference of discrimination.　Batson, 476 U.S. at 97; accord Rodriguez, ¶ 1, 351 P.3d at 428.

¶87　Defense counsel also argued that the nature of the charges against Beauvais made the case particularly susceptible to gender stereotypes.　The alleged victim was a married man with young children who communicated with Beauvais over the internet, telling her that he wanted to cheat on his wife.　When he called off the affair, Beauvais was charged with stalking and harassing him and his wife.　Given these facts, the prosecution could have believed that male jurors would be more sympathetic to the male victim, or that female jurors might hold the victim's indiscretions against him, damaging the prosecution's chances for a conviction.　Cf. J.E.B., 511 U.S. at 140 ("The potential for cynicism [toward the jury's neutrality and its obligation to follow the law] is particularly

---

[12] Purposeful discrimination in this context does not require that the prosecution harbor animus, i.e., ill will or animosity, toward women. See Purposeful, Black's Law Dictionary (10th ed. 2014). Rather, a strike demonstrates purposeful discrimination where it is based on the juror's gender or race as a proxy for the juror's assumed bias—for example, striking males in a paternity action on the assumption that men might be more sympathetic to the alleged father of an out-of-wedlock child, while women might be more sympathetic to the mother. See J.E.B., 511 U.S. at 137–38, 142, 143; Batson, 476 U.S. at 89 ("Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").

acute in cases where gender-related issues are prominent, such as cases involving rape, sexual harassment, or paternity.").

¶88     Other circumstantial evidence supports the conclusion that the peremptory strikes were based on gender.  First, although it has been settled law for over twenty years, the prosecutor apparently did not realize that <u>Batson</u> extends to gender-based strikes.  The prosecutor commented, "It has been a long time since I read that <u>Batson</u> case.  I only heard it argued in terms of race neutral causes for peremptory challenges.  So I've never heard it in terms of gender."  The prosecutor also appeared to mistakenly believe that defense counsel could not establish a prima facie <u>Batson</u> violation as long as some members of the targeted group remained on the panel.  When the defense raised a <u>Batson</u> objection after the prosecution used three peremptory challenges in a row to remove female jurors, the prosecutor responded, "There is still six women [sic] on the panel so I don't think it goes to the second prong of <u>Batson</u> where I have to single out a race neutral reason or gender neutral reason in this case."  But the fact that women remained on the panel is irrelevant to whether a <u>Baston</u> violation has occurred; where even one strike is motivated by discriminatory purpose, equal protection is violated.  <u>Foster</u>, 136 S. Ct. at 1747; <u>Snyder</u>, 552 U.S. at 477–78.

¶89     Additionally, at <u>Batson</u>'s third step, "implausible" and "fantastic" justifications should be discounted by the trial court as pretexts for purposeful discrimination.  <u>Foster</u>, 136 S. Ct. at 1752–53; <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995).  Here, some of the prosecutor's proffered gender-neutral reasons for striking the women, while reasonable on their face, crumble under closer scrutiny.  <u>See Foster</u>, 136 S. Ct. at 1749 ("On their face, [the

prosecutor's] justifications for the strike seem reasonable enough. Our independent examination of the record, however, reveals that much of the reasoning provided by [the prosecutor] has no grounding in fact.").

¶90 For example, the prosecution told the court that it struck female potential juror K.G. because she appeared young, had no kids, and because she had relationships "with a large amount of law enforcement officers." In response to the last of these proffered justifications, defense counsel observed that as a matter of common sense, "the People rarely if ever challenge a juror because of their extensive connections to law enforcement." And the record shows the prosecution lodged no objections to two male empaneled jurors who likewise had ties to law enforcement.

¶91 Another noteworthy example in this case is female potential juror S.B. The prosecutor told the court that he struck S.B. for three reasons: (1) she "looked disinterested during the questioning. . . . She never raised her hand for any issue. Never nodded when another juror spoke and oftentimes was looking away from me during my questioning looking at her watch"; (2) she appeared to be young; and (3) she had no children. Beginning, as the Supreme Court did in Snyder, with the demeanor-based reason for the strike, I observe that nothing in the record shows that the trial court ever credited the prosecution's assertion that S.B. demonstrated a lack of interest in the proceedings. See 552 U.S. at 479. Where a neutral justification for a peremptory strike involves a juror's demeanor, "the trial court's firsthand observations [are] of even greater importance." Id. at 477. Because the trial court simply denied defense counsel's Batson challenge without

13

findings and without explanation, "we cannot presume that the trial judge credited the prosecutor's assertion" that S.B. was disinterested in the proceedings. Id. at 479.

¶92 Moreover, the prosecutor's two objectively verifiable reasons for striking both K.G. and S.B.—that they were young and had no children—appear pretextual. See Foster, 136 S. Ct. at 1754 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." (alteration in original) (quoting Dretke, 545 U.S. at 241)). Defense counsel pointed out that the People accepted three male jurors who also appeared young. And six male potential jurors represented that they were childless, yet they served on the jury.

¶93 It is also significant that the prosecution asked no questions at all of two of the female potential jurors removed from the panel. "The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." Dretke, 545 U.S. at 246 (quoting Ex parte Travis, 776 So. 2d 874, 881 (Ala. 2000)).

¶94 All of this evidence—the pattern of strikes against five women, the prosecutor's ignorance of the law, the implausible proffered neutral justifications, and the prosecution's failure to question two of the jurors it struck—strongly suggests that the prosecution acted intentionally to remove the jurors because of their gender.

¶95 Despite the abundant circumstantial evidence of the prosecutor's intent to remove women from the panel, the trial court held that defense counsel had not established purposeful discrimination. In my view, the trial court's Batson analysis ultimately fell

14

short because the court appeared to misapprehend the purpose of the <u>Batson</u> challenge; was preoccupied with irrelevant concerns; and failed to make any findings crediting the prosecution's proffered justifications. In fact, the findings that the court did make actually support Beauvais' contention that the strikes were motivated by gender.

¶96 First, the trial court appeared to mistakenly believe that the prosecution could not violate <u>Batson</u> unless it removed <u>all</u> of the females from the jury. The court appeared to reason that the prosecution's inability to remove all of the women from the jury reduced the likelihood of a <u>Batson</u> violation:

> So at a minimum we are having a third to a quarter of the jurors be women. <u>I think an effort to try to remove all women from the jury when it is clear that cannot be done reduces the likelihood that the challenges were for gender-based reasons</u>. It doesn't eliminate it. It certainly keeps a jury at a minimal percentage in that regard arguably.

(Emphasis added.) To prove a <u>Batson</u> violation, however, a challenger need not establish that a party removed all members of a targeted group. The Constitution forbids striking even a single juror because of gender or race. <u>Foster</u>, 136 S. Ct. at 1747; <u>Snyder</u>, 552 U.S. at 477–78; <u>accord</u> <u>Valdez v. People</u>, 966 P.2d 587, 590 (Colo. 1998).

¶97 Next, after listening to the arguments of counsel, the trial court expressed concern about the speedy trial implications of sustaining the <u>Batson</u> objection:

> First and foremost, as a practical matter if I were to grant the challenge the result would be that we would dismiss this panel and likely reset a new trial date within speedy trial and begin again with a new panel. And I know that is something Ms. Beauvais is opposed to as a practical matter, nevertheless, she has a right to a fair jury trial.

15

To the extent that the trial court was concerned with the speedy trial implications of a Batson violation, such a concern is simply not relevant to whether any peremptory strike was impermissibly motivated by race or gender.

¶98 The trial court then turned to the merits of the parties' positions. Remarkably, the only comment that the trial court made with respect to the prosecution's explanations was to acknowledge their weakness, observing that "on the one hand I think the basis and reasons for the [prosecution's peremptory] challenges are not strong," and noting it had "concerns given the nature and the outcome and the circumstances." The court never turned to the "other hand." Instead, it observed, "I think we have a number of jurors who all likely could probably be unbiased and fair and impartial." However, whether the jurors who have been seated are fair and impartial is irrelevant to the Batson analysis.

¶99 The trial court did not discuss any of the several reasons proffered for striking the individual women. Instead, it simply concluded, "I'm going to find at this point we have not established there was purposeful discrimination."

¶100 At Batson's third step, the court must evaluate the prosecutor's credibility and decide whether a strike demonstrated purposeful discrimination; this decision "turns on factual determinations." Foster, 136 S. Ct. at 1747 (citing Snyder, 552 U.S. at 477). But crucially, the trial court made no factual determinations here. Besides the skepticism that the trial court expressed as to the prosecution's proffered justifications, the court did not make a single finding relevant to the critical step three of the Batson determination. To the contrary, the record instead reflects the trial court's concerns about the weakness of the

16

prosecution's case, the pattern of strikes, and the prosecutor's and the trial court's apparent misunderstanding of what Batson requires.

¶101 I simply cannot agree that the record in this case shows that the trial court "weighed all of the pertinent circumstances." Under these circumstances, I see no basis to defer to the trial court's ultimate Batson ruling.

### III. Conclusion

¶102 Judges and academics have criticized the Batson framework as inadequate for the task, and it is not difficult to see why. See Bellin & Semitsu, supra, at 1114 n.212 (collecting articles). To sustain a Batson objection places a trial court judge in the unenviable position of finding that an attorney standing before the court both intentionally excluded someone from the jury based on race or gender, and offered the court a pretextual reason for doing so. Id. at 1113–15. Justice Thurgood Marshall described Batson's greatest flaw as its implicit assumption that courts are capable of recognizing when a strike is exercised based on race, because, even assuming good faith on the part of all involved, Batson requires courts "to confront and overcome their own racism on all levels — a most difficult challenge to meet." Wilkerson v. Texas, 493 U.S. 924, 928 (1989) (Marshall, J., dissenting from denial of certiorari); see also Batson, 476 U.S. at 106 (Marshall, J., dissenting) (noting that "[a] prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically," and that "[a] judge's own conscious or unconscious racism can lead him to accept such an explanation as well supported."). "This flaw has rendered Batson ineffective against all but the most obvious

17

examples of racial prejudice—the cases in which a proffered 'neutral explanation' plainly betrays an underlying impermissible purpose." Wilkerson, 493 U.S. at 928 (Marshall, J., dissenting from denial of certiorari). Certainly, prosecutors' peremptory strikes can be based on nothing more than instincts about how a juror may view a case. But as Justice Marshall reminds us, "'seat-of-the-pants instincts' may often be just another term for racial prejudice." Batson, 476 U.S. at 106 (Marshall, J., dissenting).

¶103 Given that trial courts are faced with a difficult task when evaluating a Batson challenge, the role of the appellate court in protecting the constitutional rights at stake becomes all the more critical. Appellate courts are uniquely positioned to counteract the implicit bias and unconscious discrimination that can operate to exclude minority members from meaningful participation in the justice system. See Judge Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of *Batson*, and Proposed Solutions, 4 Harv. L. & Pol'y Rev. 149, 158 (2010). Reviewing courts must be willing to examine the record with a skeptical eye and reverse when necessary, so that members of the public are not excluded from jury service in violation of the Constitution.

¶104 Jury selection procedures that permit purposeful discrimination undermine public confidence in the fairness of the verdict. Georgia v. McCollum, 505 U.S. 42, 49 (1992). "The need for public confidence in our judicial process and the integrity of the criminal justice system is essential for preserving community peace." People v. Cerrone, 854 P.2d 178, 196 (Colo. 1993) (Scott, J., dissenting). It is therefore "of paramount importance that the

18

community believes we guarantee even-handed entry into our criminal justice system by way of the jury panel."  Id.

¶105 The result of today's decision, I fear, is that peremptory challenges will become "largely immune from constitutional scrutiny."  Batson, 476 U.S. at 92–93.  I respectfully dissent.